In re Mary Ann SHANAHAN, Debtor.

**J.C. PENNEY COMPANY,
INC., Plaintiff,**

v.

**Mary Ann SHANAHAN, Defendant.**

**Bankruptcy No. 92–10990 K.**
**Adv. No. 92–1179 K.**

Paul M. Aloi, Rochester, NY, for plaintiff.

Barry H. Sternberg, Kenmore, NY, for defendant/debtor.

MICHAEL J. KAPLAN, Chief Judge.

This action under 11 U.S.C. § 523(a)(2)(A) came on for trial on December 30, 1992. It alleges fraud arising out of the Debtor's use of a credit card to buy Christmas presents, at a time when she was unemployed and heavily in debt. This Court finds that fraud has been established by a preponderance of the evidence [1], and that the creditor J.C. Penney must prevail in this action.

1. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### CREDIT CARD ABUSE AS FRAUD

Abuse of credit cards or of lines of credit defies traditional analysis of "frauds." This is because two of the five elements that traditionally define a "fraud"[2] are a false "representation" and "reliance" thereon: Although a credit card or line of credit frequently is initially issued on the basis of representations concerning assets, income and debts, the method of using such accounts after they are established is such as to leave one wondering where these two elements might be found in a given transaction at a later point in time when assets, income or debts might have changed[3]. Is there a new "representation" each time the account is used, and if bankruptcy ensues and the account is not paid can it be said that the representation was "false" and that the creditor "relied" thereupon? At least three schools of thought have emerged in the cases analyzing credit card or line-of-credit use as fraudulent under 11 U.S.C. § 523(a)(2)(A). This Court cannot improve upon the examination of these schools of thought offered by other Courts.[4] As explained therein, the three schools of thought are:

(1) that each use of a charge account is an implied representation of ability and intent to repay;

(2) that the card issuer assumes the risk of use or abuse, up to the credit limit or until the card is revoked; and

(3) that there is an implied representation of intent to pay (but not of ability).

Without quarreling with the wisdom of the approach taken by the Courts that have examined the problem in such terms, this Court takes a more fundamental view of this issue. This Court finds that some fraudulent acts—some tricks, deceptive devices or artifices—do not involve "reliance" upon a "representation." Some artifices or pretenses or devices are frauds even if there is no real "representation" (but merely an action or impetus) and no real "reliance" (but merely an anticipated response or consequence).

Slavish adherence to the "five elements of fraud" set forth at footnote 2 above was not required at common law, for it was long recognized that "fraud" was far broader in concept. This is well summarized in 37 Am.Jur.2d, Fraud and Deceit § 1:

[W]hile it has often been said that fraud cannot or should not be precisely defined, the books contain many definitions, such as unfair dealing; malfeasance, a positive act resulting from a wilful intent to deceive; an artifice by which a person is deceived to his hurt; a wilful, malevolent act, directed to perpetrating a wrong to the rights of others; anything which is calculated to deceive, whether it is a single act or a combination of circumstances, or acts or words which amount to a suppression of the truth, or mere silence; deceitful practices in depriving or endeavoring to deprive another of his known right by means of some artful device or plan contrary to the plain rules of common honesty; the unlawful appropriation of another's property by design; and making one state of things appear to a person with whom dealings are had to be the true state of things, while acting on the knowledge of a different state of things. Fraud has also been said to consist of conduct that operates prejudicially on the rights of others and is so intend-.

---

**2.** (1) That the Debtor made representations; (2) that at the time, the Debtor knew the representations were false; (3) that the Debtor made them with the intention and purpose of deceiving the creditor; (4) that the Creditor relied on such representations; and (5) that the Creditor sustained the alleged loss and damage as the proximate result of the representations. *In re Dougherty,* 84 B.R. 653, 656 (9th Cir.BAP 1988).

**3.** The Court need not belabor the point that a "credit card purchase" involves, at most, the signing of a sales draft and the retailer's checking with the card issuer to make sure that the

card has not been reported stolen, and to give the issuer a chance to make sure that the account is not delinquent or over the credit limit. Then the goods are handed over.

**4.** In particular see *In re Dougherty,* 84 B.R. 653 (9th Cir.BAP 1988), and *In re Faulk,* 69 B.R. 743 (Bankr.N.D.Ind.1986). Also consider *In re Cirineo,* 110 B.R. 754 (Bankr.E.D.Pa.1990) and *In re Labuda,* 37 B.R. 47 (Bankr.M.D.Fla.1984). But see *First Nat. Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983).

ed; a deceitful design to deprive another of some profit or advantage; or deception practiced to induce another to part with property or to surrender some legal right, which accomplishes the end desired. Fraud therefore, in its general sense, is deemed to comprise anything calculated to deceive, including all acts, omissions and concealments involving a breach of legal or equitable duty, trust, or confidence justly reposed, resulting in damage to another, or by which an undue and unconscientious advantage is taken of another. [Citations Omitted.]

Thus the Supreme Court has stated (at least in the context of the criminal law of mail frauds) that "the words 'to defraud' ... have the 'common understanding' of 'wronging one in his property rights by dishonest methods or schemes' and 'usually signify the deprivation of something of value by trick, deceit, chicane or over-reaching.'" *Carpenter v. U.S.*, 484 U.S. 19, 27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275, 284 (1987).

■ Furthermore, it is evident from 11 U.S.C. § 523(a)(2)(A) itself that "actual fraud" does not require a false representation, for that provision speaks of "false pretenses, a false representation, *or* actual fraud." [Emphasis added.] The disjunctive bespeaks a distinction among the three.

■ It can be seen, therefore, that resort to concepts of "implied representation" is not always necessary when examining a question of fraud in the use of a credit card. Such resort, furthermore, may achieve untoward results, for the "implied representation" theory seems to imbue every use of a credit card with implications that may be totally unfounded in the case of any particular user, implications that turn the burden of proof of fraud on its head. For example, is a simple-minded person who has obtained a credit card (he probably received congratulations for his "pre-approval" in the mail) really making an "implied representation" of his ability to pay when in fact he may have severely limited knowledge of his financial resources or even of his duty to repay, and merely does exactly what the issuer prompts him to do—use the card? (This Court has had the experience of a case in which a mentally-impaired debtor was issued an unsolicited card, and was proven at trial to lack the mental aptitude to know that she had to pay for merchandise charged on a credit card.) Such a debtor should not be put to the burden, on penalty of a finding of fraud, of proving that he or she is a simpleton. The burden is on the creditor to prove fraud—to prove that the debtor knew full well that any professed intention to repay was false or was known by the debtor not to be well-grounded, and that he or she nonetheless deliberately used the card to obtain goods he or she knew were beyond his or her ability to pay.

If the creditor can make such a showing, then a professed intention to repay on the part of the user—even highly positive hopes and plans to repay—might not purge an otherwise sophisticated cardholder's actions of fraud. Stated otherwise, the fact that one has profoundly fooled oneself with regard to the prospects for the future should not mean that any consequent damage to others was merely inadvertent and not fraudulent.

■ While there is some analytic appeal to the conclusion that the card issuer has assumed the risk that the card would be used in this manner[5] this Court cannot agree that actual fraud is something of which one assumes the risk. The issuer of a credit card or credit line perhaps assumes the risk of the user's ignorance, mistake, naivete, gullibility, misfortune, accident, or other innocent failing or adversity, but the Court declines to apply assumption of risk theory to the user's knowing and intentional use of the card to obtain goods without any realistic prospect of having the wherewithal to pay.

■ In sum, this Court finds that deciding whether credit card use was fraudulent does not require resort to the so-called

5. *First Nat. Bank of Mobile v. Roddenberry*, 701     F.2d 927 (11th Cir.1983).

"traditional five elements of fraud," for the term "fraud" has broader meaning.

## THE PRESENT CASE

The Court will leave the matter of a third party card,—a "bank card"—to another day.[6] Here the card is a J.C. Penney Card and the Court will presume it to be a two-party card: just J.C. Penney and the debtor. The debtor (and her son, at the debtor's request) charged over a thousand dollars at J.C. Penney's for Christmas gifts in December of 1991 on her theretofore inactive J.C. Penney Charge Account. (Plaintiff's Exhibit # 2). Each charge slip is signed by the debtor, or by her son at her direction, at the place where it boldly and conspicuously states: "The cardholder acknowledges receipt of goods/services in the total amount shown hereon and agrees to pay the card issuer according to its current terms."

■ At the time of the charges the debtor had been out of work for five months, after having worked eleven years in a business office. She is articulate and presents herself well. She has bookkeeping experience and was seeking a bookkeeping or data entry job. She was receiving approximately $160.00 per week in unemployment compensation. The debtor had had approximately seven interviews during the five month period, and though she testified that she had "good prospects" for employment to begin the next month, she "couldn't [now] say" who those prospects were with. Her rate of pay at her previous job is not in evidence, but it appears that her work was bookkeeping and office clerical.

At the time she made these charge purchases, her only assets were household goods and an automobile. She rented her home. Yet she admitted "perhaps" more than $20,000 in aggregate balance due on a number of other accounts, some of which were retail store or bank-card charge accounts having outstanding balances of $2,000–$3,000 each.

She may have been fully sincere (both at the time she testified to the Court and at the time she incurred the charges) in declaring her wholehearted "intent" to repay those obligations. But within the next sixty days after the goods were obtained, she obtained new employment that she determined was at insufficient pay to repay her debts in whole or in part (a lesser pay than her previous job), and she consulted with an attorney in late February, 1992 about filing bankruptcy. The Petition was in fact filed under Chapter 7 on March 20, 1992. She had made no meaningful effort to repay these charges.

The debtor was not unsophisticated. She knew the scope of her indebtedness. She knew that her prospects for repaying the charges did not rise to an "expectation" or even a "probability"; rather, her professed intention to repay must have appeared unrealistic even to her. Nonetheless it was understandably important for her to buy Christmas gifts for her family.

## INTENT TO TRICK OR OVERREACH MAY BE FRAUD EVEN WITHOUT INTENT TO DAMAGE

■ Some disciplines or callings aside from the law might have no difficulty with the notion that one might intend to trick someone else but not intend to damage that someone. Criminal Law sometimes recognizes such nuances, but more often it charges one with the reasonably foreseeable consequences of an intentional act, even if those consequences were not themselves intended. The law of frauds in the context of bankruptcy might cease its utility if it were not to impose similar liability. It seems clear that if damage results from trickery or overreaching or sham or the like, then that is sufficient to establish fraud as to any consequent damage even if the debtor had hoped to make the other party whole.

Few would disagree that if I were to knowingly and intentionally overstate my assets and understate my liabilities in order

---

**6.** The 3rd party issuer is subject to an agreement with the retailer. This may or may not be important.

to obtain a loan, and if I were to obtain it on the basis of that deception, and if damage were to result, I would be defrauding the creditor even if all the while my honest intention had been to repay the loan if it were to be obtained.[7] It is not my prerogative to decide what the lender needs to know, and I cannot justify my placing the lender at risk through intentional falsehoods on the grounds that I meant the lender ultimately no harm. The result should be no different when the overreaching is the act of invoking an account which I know I cannot pay, knowing further that if I do so, the vendor must hand over the goods. The use of the card is conduct designed to achieve an improper advantage. The release of the goods is the response which the pretense was intended to achieve. The contractual relationship has been used in a harmful manner, knowing that damage is nearly certain to result. Under the circumstances of the case at Bar, this is fraud.

## CONCLUSION

The Debtor's charge account purchases from J.C. Penney are non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

Plaintiff's exhibits 1 through 4 were admitted into evidence on Stipulation of the parties, except that the defendant did not stipulate to having made charges in the full amount reflected therein—nearly $1400.00. Having had the opportunity since trial to reflect upon the exhibits, it is not clear to the Court whether the parties had stipulated to a lesser amount. If there was no stipulation as to amount, then the Court finds that all new charges reflected on Exhibits 1 through 4 were incurred by the debtor, or upon her direction and authority, and should be declared non-dischargeable in accordance with the above. If the parties have stipulated to a lesser amount, then that amount will be declared non-dischargeable.

Counsel for J.C. Penney shall submit to the Clerk of the Court, on notice to opposing counsel, an affidavit of amount due, including costs and prejudgment interest, but not attorneys fees,[8] and the Clerk shall enter money judgment thereon, which judgment is excepted from the debtor's discharge in this case. Postjudgment interest shall be awarded in accordance with law.

SO ORDERED.

---

7. Such a fraud would be governed by 11 U.S.C. § 523(a)(2)(B), the "false financial statement" provision, rather than by 523(a)(2)(A).

8. *In re Marie B. King*, 135 B.R. 734 (Bankr. W.D.N.Y.1992).