In re James L. **PARKHURST**, Maureen E. Parkhurst, Debtors.

**MBNA AMERICA**, Plaintiff,

v.

James L. **PARKHURST**, Defendant.

Bankruptcy No. 95–61577.

Adv. No. 95–70168.

United States Bankruptcy Court, N.D. New York.

June 21, 1996.

Evans, Bankert, Cohen, Lutz & Panzone, Utica, NY, for MBNA America; Robert J. Speidel, of counsel.

James L. Parkhurst, Herkimer, NY, Pro Se.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

The Court considers herein the adversary proceeding commenced on August 2, 1995, by MBNA America ("MBNA") seeking a denial of dischargeability of a debt incurred by James L. Parkhurst ("Debtor") pursuant to § 523(a)(2)(A) of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code"). MBNA also requests an award of attorneys' fees, costs and interest pursuant to its credit card agreement with Debtor. Issue was joined by service of an answer on behalf of Debtor on August 23, 1995.

A trial of this proceeding was originally scheduled to be held on December 14, 1995.

However, on November 13, 1995, Debtor's attorney filed a motion to withdraw from the case. The Order granting the motion was signed on November 30, 1995, and provided that it would take effect 30 days from the date of the Order.

On April 3, 1996, a trial of this proceeding was held at Utica, New York. The Debtor, representing himself *pro se*, was the only witness to testify at the trial. At the completion of the testimony, MBNA moved to amend its complaint to include a cause of action based on Code § 523(a)(14). The matter was submitted for decision on April 3, 1996.

### JURISDICTIONAL STATEMENT

This Court has core jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(I).

### FACTS

Sometime in the end of January, 1995, Debtor testified that he accompanied his wife to a meeting with James Selbach, Esq. ("Selbach") to discuss her filing a bankruptcy petition. According to the Debtor, Selbach advised him that he should consider filing a joint petition along with his wife in order to avoid having to assume approximately $30,-000 of her debt should she file individually.

On May 8, 1995, the Debtor and his wife filed a joint voluntary petition ("Petition") seeking relief pursuant to Chapter 7 of the Code.[1] The Petition was signed by Selbach on March 20, 1995 (*see* MBNA's Exhibit 7); however, the Debtors did not sign it until April 10, 1995 (*see id.*). According to Debtor's bank statement, dated March 17, 1995, a check was issued in the amount of $660.00 on or about March 6, 1995, which Debtor identified as the retainer paid to Selbach (*see* MBNA's Exhibit 5). Debtor testified that it was possible that the check issued to Selbach had actually been written sometime around the end of February.

---

1. Debtor testified that approximately six months after the case was commenced, he and his wife were divorced. For purposes of this decision, however, the Court will refer to her as Debtor's "wife."

Between February 15, 1995, and February 25, 1995, Debtor incurred charges totalling $2,505.35 on his credit card with MBNA, including a $2,000 cash advance on February 15, 1995 (*see* MBNA's Exhibit 2). Debtor testified that he thought the account had been opened approximately three months before the charges were incurred in February and this was confirmed by MBNA's counsel who indicated that the account had been opened in November 1994. Debtor also testified that until the charges in February 1995, the account balance had remained at "0".

It was the Debtor's testimony that he had used approximately $1,200 of the $2,000 cash advance to pay his 1994 income taxes. The actual amount paid was $1,144.16 (*see* MBNA's Exhibit 6).[2] The balance of the monies had been used to purchase a 1986 Mercury Topaz.

Received in evidence was an account statement for Debtor's AT & T Universal Card for charges incurred between February 9, 1995, and February 28, 1995. The statement shows a prior balance of $2,024.96, new purchases of $1,834.80 and cash advances totalling $2,450.00 (*see* MBNA's Exhibit 3). Debtor testified that although the account was in his name, he had allowed his wife to use the card in connection with household expenses as she was unemployed and had two children living at home with her.

According to Schedule I of Petition, the Debtor's total monthly income after deductions was $1,435 (*see* MBNA's Exhibit 4). In addition, $325 is listed as alimony, maintenance or support payments received by his wife as income, for a total combined income of $1,760 (*see id.*).[3] Debtor testified that in addition to his income from his full-time job with Curtains & Fabrics, he also earns between $30 and $360 per month teaching martial arts; however, that income was not included in the Petition. It was also his testimony at the trial that he now has a third job selling real estate.

Schedule J of the Petition shows expenses totalling $2,460 (*see id.*). Debtor estimated that his share of the monthly expenses totalled only $600, exclusive of approximately $400 paid in child support. The balance of expenses, namely $1,860, were identified by him as belonging to his wife.

Debtor testified that he had filed the Petition to assist his wife. It was also his testimony that he had not needed to file bankruptcy and had always paid his bills as they became due. When questioned why he had not made the minimum payments due on the MBNA and AT & T Universal credit card accounts of $50 and $343.84, respectively, he stated that he had used those monies to pay Selbach's retainer.

## DISCUSSION

### Amendment of Complaint

■ Rule 15(b) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), incorporated by reference in Rule 7015 of the Federal Rules of Bankruptcy Procedure ("Fed. R.Bankr.P."), permits the amendment of the pleadings to conform to the evidence and provides that the court *shall* freely allow the pleadings to be amended in the absence of any evidence that there would be any prejudice to the party in maintaining the action or defense upon the merits. The rule comports with the general policy that "controversies should be decided on the merits and not on procedural technicalities." *In re North American Dealer Group, Inc.*, 62 B.R. 423, 427 (Bankr.E.D.N.Y.1986).

■ Whether to allow the amendment of the complaint is a matter of the Court's discretion. *Matter of Gross*, 175 B.R. 277, 283 (Bankr.N.D.Ind.1994); *Kurtzman v. Charles (In re Walter T. Murphy, Inc.)*, No. 94 CIV. 8094, 1995 WL 35672 at *2 (S.D.N.Y. Jan. 30, 1995). Normally if a cause of action, although not set forth in the complaint, is tried by express or implied consent of the

---

2. Debtor explained that he had anticipated receiving a refund of $1,800 by filing a joint return with his wife. However, she elected to file an individual return whereby she received a refund of $3,000 and Debtor was required to pay approximately $1,200.

3. Debtor testified that he pays his wife approximately $90.00 per week in child support. There was no testimony regarding the source of the $325.00.

defendant(s), "the pleading may be deemed amended to conform." *In re Chryst*, 177 B.R. 486, 497 (Bankr.E.D.Pa.1994), quoting *Schultz v. Cally*, 528 F.2d 470, 474 (3d Cir. 1975) (citation omitted). In this case the Debtor not only represented himself *pro se*, but he also was the only witness, making it unlikely that he would object to any questions posed him by MBNA's counsel. However, from the Court's perspective, the important consideration in this case is not whether the Debtor consented to the admission of the evidence in support of a cause of action based on Code § 523(a)(14), but rather whether the Debtor would be unduly prejudiced if the Court permitted MBNA to amend its complaint.

Debtor was aware that MBNA was seeking to determine whether the debt owed to it as a result of certain credit card transactions was dischargeable. Debtor testified that a portion of the cash advance received using his MBNA credit card was used to pay his 1994 income taxes. MBNA's inquiry concerning the use of the card was well within the parameters of information expected to be elicited from the Debtor at trial pursuant to Code § 523(a)(2)(A) and was relevant to that particular cause of action. It is also clear that the Debtor could not have prepared any type of separate defense regarding a cause of action based on Code § 523(a)(14) since the only element necessary for MBNA to establish was that the monies were used to pay off a nondischargeable income tax liability. The Court concludes that the Debtor will not be prejudiced and, accordingly, the Court will allow the amendment of MBNA's complaint to include a cause of action pursuant to Code § 523(a)(14).

*Dischargeability Analysis*

■ In order to effectuate the fresh start purpose of the Code, exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the honest but unfortunate debtor. *In re Leventhal*, 194 B.R. 26, 28 (Bankr.S.D.N.Y.1996) (citations omitted). The burden is on the petitioning creditor to establish by a preponderance of the evidence that the particular debt should not be discharged. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Adversary proceedings commenced for purposes of determining the dischargeability of a debt pursuant to Code § 523(a)(2)(A) are common place. In recent years, this Court, like so many other bankruptcy courts across the country, has received an influx of complaints filed on behalf of credit card companies. One might argue that the increase in these adversary proceedings is the result of a concerted effort on the part of the credit card industry to reduce the losses, which ultimately are imposed on the non-defaulting users of credit cards in the form of higher finance charges and interest rates, by asserting their rights as to debts they previously have chosen to ignore and write off. However, it is more likely that the increase in adversary proceedings is simply a reflection of the rapid growth of the credit card industry and its practice of mailing "pre-approved" credit card solicitations that fill the mailboxes of consumers on a weekly basis.[4] Consumers are offered no annual fees, reduced interest rates for the first six months to a year, higher credit limits, and the opportunity to consolidate other credit card debt. In many instances, those same consumers, having accepted the issuers' offer in the hopes of solving their credit problems, find themselves facing escalating obligations which they are unable to pay and having to seek relief in the bankruptcy courts.

In the context of credit card debts, the decisions interpreting Code § 523(a)(2)(A) are numerous and to a certain degree conflicting. *Leventhal, supra*, 194 B.R. at 28. This Court has on several occasions addressed the subject. *See e.g. In re Nichols*, Ch. 7 Case No. 91–01134, Adv. No. 91–60170 (Bankr.N.D.N.Y. Nov. 30, 1992); *In re Cameron*, Ch. 7 Case No 92–62959, Adv. No. 92–70243 (Bankr.N.D.N.Y. Dec. 9, 1993); *In re*

---

4. The situation has caused concern not only to the courts but to others, as well, including Federal Reserve Board Chairman Alan Greenspan. *See Is Reliance Becoming The Issue in Credit Card Dischargeability Actions?*, 28 BANKRUPTCY COURT DECISIONS at A8 (Mar. 26, 1996). (Greenspan had indicated that consumers can go quickly from paying on time to bankruptcy, noting "People go off the cliff without any warning they are in trouble.").

*Ladouceur,* Ch. 7 Case No. 94–60226, Adv. No. 94–70066 (Bankr.N.D.N.Y. Jan. 18, 1995); *In re Hoalcraft,* Ch. 7 Case No. 94–62146, Adv. No. 94–70177 (Bankr.N.D.N.Y. Sept. 11, 1995), and *In re Reilly,* Ch. 7 Case No. 94–62110, Adv. No. 94–70162, slip op. at 8 (Bankr.N.D.N.Y. Sept. 27, 1995).

The cases recognize that when credit card debt is involved, the establishment of the traditional elements of fraud, namely false representation, intent to deceive, reliance and damages, pursuant to Code § 523(a)(2)(A), is somewhat problematic for the credit card issuer since the actual credit card transaction is either between the cardholder and merchant in the situation where goods or services are being provided, or between the cardholder and the automatic teller machine from which monies are advanced directly. The cardholder has not directly represented anything to the issuer of the credit card at the time of the transaction. *See e.g. Cameron, supra,* slip op. at 6–7; *In re Murphy,* 190 B.R. 327 331 (Bankr.N.D.Ill. 1995); *Matter of McKinnon,* 192 B.R. 768, 771 (Bankr.N.D.Ala.1996).

To resolve this problem, a minority of courts adhere to the "assumption of risk doctrine" whereby the card issuer assumes any risk associated with the use of the card until the use is revoked and notice of said revocation is received by the cardholder. *See e.g. First Nat'l Bank of Mobile v. Roddenberry, (In re Roddenberry),* 701 F.2d 927 (11th Cir.1983) [5]; *In re Carpenter,* 53 B.R. 724 (Bankr.N.D.Ga.1985); *but see In re Shanahan,* 151 B.R. 44, 47 (Bankr.W.D.N.Y. 1993) ("Court cannot agree that actual fraud is something of which one assumes the risk.")

The Court of Appeals for the Second Circuit has not had occasion to address the issue. *Leventhal, supra,* 194 B.R. at 30. Most courts have adopted a modified approach referred to as the "implied representation doctrine."[6] *Id.* at 29. Under this approach, generally the courts have examined whether, at the time the card was used, the debtor had the intent to repay the debt and reasonably believed in his or her ability to do so. *Id.* A few courts have concluded that the use of a credit card is an implied representation by the holder of the card that he/she has both the intent *and* the ability to pay the issuer of the card for the charged purchases and/or advances. *Id.; but see In re Cox,* 182 B.R. 626 (Bankr.D.Mass.1995) (Code § 523(a)(2)(A) does not encompass implied representation of intent to pay "when both the representation and the absence of intent to pay must be based upon inference.") *Id.* at 636.

▮ This Court has employed the implied representation approach in its cases referenced above. It found, however, that the fact that a debtor's credit card obligations may have exceeded his income at the time the charges were incurred does not *per se*

---

**5.** As pointed out by the court in *Matter of Ford,* 186 B.R. 312 (Bankr.N.D.Ga.1995), the *Roddenberry* decision was based on the predecessor of Code § 523(a)(2)(A) which did not include "actual fraud" as an element for consideration. *Id.* at 318.

**6.** Some courts have rejected the application of this doctrine, asserting that the typical credit card transaction involves no representation, express or implied. *See e.g. In re Alvi,* 191 B.R. 724, 731 (Bankr.N.D.Ill.1996) (J. Ginsberg). Judge Ginsberg relied on the Supreme Court decision in *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), in which Justice Blackmun concluded that "a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.' *Id.* at 284, 102 S.Ct. at 3091. In that case, the Supreme Court focused on an element of a criminal statute requiring that there be a knowingly false statement. Judge Ginsberg found a similarity between the issuance of a check and the use of a credit card and, while acknowledging that there

may be circumstances in which the use of a credit card could constitute a "representation" for purposes of Code § 523(a)(2)(A) (*see id.* at 732, n. 14), held that the use of a credit card in a credit transaction is not, *per se,* a representation. *Id.* at 732. This Court previously distinguished the analysis in *Williams* in an unpublished decision (*Adirondack Bank v. Amodio (In re Amodio,* Ch. 7 Case No. 92–63411, Adv. No. 93–70157, slip op. at 15–17 (Bankr.N.D.N.Y. Sept. 21, 1994), concluding that for purposes of Code § 523(a)(2)(A), the issuance of a check constitutes an implied representation that there are funds available in the account. *Id.* at 17; *but see In re Horwitz,* 100 B.R. 395, 398 (Bankr.N.D.Ill. 1989) (*Williams* analysis is just as relevant to interpreting Code § 523 based on the view that exceptions to discharge are to be strictly construed in favor of the debtor.). The Court finds no reason to alter its view with respect to the use of a credit card.

sustain non-dischargeability. *See Cameron, supra* slip op. at 7 (citing *In re Dougherty,* 143 B.R. 23, 26 (Bankr.E.D.N.Y.1992)). Indeed, the Court agrees that one should not imply any representation on the debtor's part concerning his/her *ability* to pay at the time the card was used. *See Ford, supra,* 186 B.R. at 317 n. 4 (Making a credit card user an absolute guarantor of his ability to pay offends bankruptcy policy that favors narrow construction of non-dischargeability provisions and generally gives the debtor the benefit of the doubt (citations omitted)); *Alvi, supra,* 191 B.R. at 733 ("[O]bjective ability to pay at the time of the transaction is not the issue. The issue is the Debtor's subjective intent to repay the debt."); *Murphy, supra* 190 B.R. at 332 ("One of the principal reasons people rely on credit is a present lack of ability to pay." Use of credit card is merely a representation of future action, i.e. the promise to pay in the future.); *Leventhal, supra,* 194 B.R. at 30 ("This Court agrees with the decisions which conclude that it is neither factually nor legally appropriate to imply or infer a representation of ability to repay.").

The court in *Shanahan* declined to resort to either concept of "implied representation" and simply focused on the question of fraud without limiting the analysis to the traditional elements. *Shanahan, supra,* 151 B.R. at 47–48. The Court supported its approach by pointing out that Code § 523(a)(2)(A) speaks in the disjunctive and distinguishes between false pretenses, a false representation and actual fraud. *Id.* at 47. Therefore, one should not have to focus on representation. Rather, one can apply a broader analysis of "fraud." *Id.* at 46, citing 37 Am.Jur.2d, *Fraud and Deceit* § 1.

Whether one takes the approach that there can be no representation of either intent or ability to pay when an individual uses a credit card or that the representation,

at least to the extent that it concerns an intent to pay, is "implied," the Court's analysis should center on the actual state of mind of the Debtor at the time the charges were incurred. As pointed out in *Shanahan,* the Court's focus should be on whether the creditor has proven "that the debtor knew full well that any professed intention to repay was false or was known by the debtor not to be well-grounded, and that he or she nonetheless deliberately used the card to obtain goods he or she knew were beyond his or her ability to pay." *Id.* at 47; *see also Murphy, supra,* 190 B.R. at 333–34 (The question is "whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent."). Determining whether a debtor had the intent to defraud the creditor requires consideration of all the circumstances.[7] *Id.* at 333. Accordingly, the Court, on a case-by-case basis, must weigh the credibility of the witness, as well as the evidence introduced at trial.

The Court found the Debtor to be a credible witness at trial. He testified that he obtained a cash advance of $2,000 using his MBNA credit card in February 1995. The monies were used to pay his 1994 income taxes and to purchase a used automobile. In February 1995, he also purchased goods and services in the amount of $505.35 using his MBNA credit card. According to his testimony, the only reason for filing the joint petition was to assist his wife who apparently had been unable to pay her bills as they became due.[8]

Nevertheless, the fact is that the Debtor did file a petition along with his wife early in May after consulting with Selbach. Based on Debtor's testimony, it is apparent that he was aware that most debts incurred prepetition would be discharged by the filing of the petition. In this context, the Debtor and his wife continued to incur debt using both the

---

7. The courts often cite to various factors including the number and amount of the charges, the length of the time between the charges and the filing of the petition, the financial condition of the debtor at the time the charges were incurred, etc. *see Leventhal,* 194 B.R. at 29; *McKinnon, supra,* 192 B.R. at 773.

8. According to Schedule F of the Petition, all debts were listed as joint debts. This comports with the Debtor's testimony that Selbach had advised him that if he did not file with his wife, he would be liable for any joint debts that were discharged in her bankruptcy case if she was to file on an individual basis.

MBNA credit card and the AT & T Universal card after consulting Selbach. While Debtor testified that he generally paid his bills as they became due, in this instance he failed to make the minimum payment of $50.00 due on April 8, 1995, to MBNA after having reached the $2,500 credit limit on the card. It was Debtor's testimony that he would have had sufficient monies to pay on both credit card accounts but for the fact that he had paid Selbach's retainer in late February or early March. Debtor's bank account reveals a balance of $367.51 on or about March 17, 1995, after the payment to Selbach. In addition, Debtor testified that along with a full-time job with Curtains and Fabrics he also supplemented his income teaching martial arts. It is reasonable to assume that the Debtor should have had sufficient monies to pay the $50.00 minimum payment in May. Support for this conclusion is found in the fact that Debtor also testified that his monthly income exceeded his personal living expenses and that he generally made it a practice to pay his bills as they became due. The Court also questions the reason why the Debtor found it necessary to take out a cash advance to pay his income taxes in February after consulting with Selbach, rather than waiting until April 15, 1995, when they were due. Weighing these various factors, the Court concludes that at the time the Debtor incurred the charges in February he had no intention to repay the debt to MBNA as he anticipated filing bankruptcy with his wife.

 Having found that the Debtor falsely represented his intent to repay the debt to MBNA when he used the credit card, the Court must then focus on whether MBNA justifiably relied on Debtor's implied representation that he intended to pay the debt.[9] In *Field v. Mans, infra,* the Supreme Court discussed "justifiability" as set forth in the RESTATEMENT (SECOND) OF TORTS § 541, which states that a person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of

which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* In other words, if the facts alert the creditor to the possibility that it is being deceived, only then is it necessary for the creditor to make an independent investigation. *Id.*

 This requires the Court to examine all the facts available to the creditor at the time the representation was made. *See generally, In re Willis,* 190 B.R. 866, 870 (Bankr. W.D.Mo.1996), citing *Field v. Mans, supra,* —— U.S. at ——, 116 S.Ct. at 444. Just as one considers the totality of circumstances when considering whether a debtor misrepresented his intent to pay the debt, so too the creditor should be expected to present the court with information from which it can make a determination of justifiable reliance. Said information should include the history of the use of the card and the payments by the debtor, as well as his/her ability to pay the debt at the time the card was used and the representation alleged.

In this instance, there was no record of prior use or misuse by the Debtor on which MBNA might have relied. If MBNA had done a cursory check of the Debtor's finances at the time the card was used, according to the Debtor's own testimony, it would have discovered that he generally paid his bills as they became due. MBNA would also have discovered that Debtor had at least one, if not two, sources of income from which to make the payment on the debt. As noted above, Debtor also testified that his income was more than sufficient to cover his personal expenses and to pay any credit card debt that he incurred. Therefore, at the time the credit card was used, the Court concludes that MBNA certainly was justified in relying on the Debtor's representation that he intended to pay the debt at the time he used the credit card without having to conduct a separate credit check at the time of the transaction.[10]

The Court concludes that MBNA has presented sufficient factual proof pursuant to

9. The Supreme Court recently held that with respect to Code § 523(a)(2)(A), the movant must establish that it "justifiably" relied on the representation of the debtor. *See Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

10. Realistically, the courts cannot expect a credit investigation of the user each time there is a transaction with the card. The reality is that the use of credit cards has become a way of life for consumers in this country, whether for good or

Code § 523(a)(2)(A) to establish that its debt should be deemed nondischargeable. Therefore, the Court need not consider whether MBNA has established a basis for granting it relief pursuant to Code § 523(a)(14).

*Attorneys' Fees and Costs*

█ In connection with the commencement of this action, MBNA seeks an award of attorneys' fees and costs. In its complaint MBNA states that its account contract with the Debtor requires the payment of reasonable attorneys' fees and costs incurred in the collection of said account. MBNA has not provided the Court with any evidence of the contract on which it might rely in considering MBNA's request. Code § 523(d) provides for the award of attorneys' fees and costs to the debtor in the event that the complaint asserts a cause of action pursuant to Code § 523(a)(2) and it is determined that it was not substantially justified. According to the legislative history, however, Congress did not provide for the award of attorneys' fees and costs to the creditor in the event that it prevailed. *See In re Kerbaugh,* 162 B.R. 255, 266 (Bankr.D.N.D.1993), citing H.R.Rep. No. 595, 95th Cong., 2d Sess. at 131, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 6092. Without proof of a contractual basis for the award of attorneys' fees and costs, the Court must deny MBNA's request.

Based on the foregoing, it is hereby

ORDERED that MBNA's motion seeking to amend its complaint to add a cause of action pursuant to Code § 523(a)(14) is granted;

ORDERED that the debt to MBNA in the amount of $2,505.35, plus interest, is determined to be nondischargeable pursuant to Code § 523(a)(2)(A); and it is further

ORDERED that MBNA's request for attorneys' fees and costs in connection with the adversary proceeding herein is denied.

for bad. According to a recent article, consumers are presently paying an additional four percent interest on their credit cards to cover the cost of bankruptcy losses. *See Is Reliance be-*coming the Issue in Credit Card Dischargeability Actions?, *supra,* at A8. Monthly credit checks are likely to increase the cost. *Id.*