**In re Philip D. BIRD and Amy Wickersham–Bird, Debtors.**

**STAR BANC FINANCE, INC., Plaintiff,**

**v.**

**Philip D. BIRD and Amy Wickersham–Bird, Defendants.**

**Bankruptcy No. 96–12437.**
**Adversary No. 96–1166.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

March 31, 1998.

Philip D. Bird & Amy Wickersham–Bird, pro se.

Richard Nelson, Cohen, Todd, Kite & Stanford, Cincinnati, OH, Chapter 7 Trustee.

William P. Coley, II, Cincinnati, OH, for Star Banc.

## OPINION AND ORDER

JEFFERY P. HOPKINS, Bankruptcy Judge.

We are asked in this adversary proceeding to decide the familiar question whether debts incurred on the eve of bankruptcy by a husband and wife may be excluded from the general discharge granted debtors under 11 U.S.C. § 727(b). Star Banc Finance Inc. ("Star"), the Plaintiff in these proceedings, made two loans to Defendants, Philip D. Bird and Amy Wickersham–Bird, only three months before the couple decided to meet with an attorney and file for relief under chapter 7. Star charges that the loans are excludable from the discharge pursuant to 11 U.S.C. § 523(a)(2)(A) and (C)—the fraud exceptions. The Court has jurisdiction over the case pursuant to 28 U.S.C. § 1334, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

A trial was held on March 6, 1997. Critical to the determination in this case is the credibility and conduct of the Debtors and, ultimately, whether or not they intended to deceive the creditor.

The Court relied heavily upon the credibility of the Debtors as witnesses and considered each of the documents which were admitted at trial, along with the arguments raised by counsel, whether or not specifically mentioned in this opinion.[1] We conclude based on that review and a consideration of the totality of all the circumstances in this case, that the narrow exceptions to discharge contained in the Bankruptcy Code are inapplicable. Therefore, we reject the Plaintiff's complaint objecting to the discharge of its debts.

## FINDINGS OF FACT

Until February 1996, Debtors, Amy and Philip Bird, earned modest incomes from their employment and were able to satisfactorily service the debts which they had accumulated over the years. Amy Wickersham–Bird worked as a clerical employee for J.C. Penney Credit earning $8.10 per hour. Her husband, Debtor Philip Bird, worked at Drew Nieman Plumbing earning $8.00 per hour. Both Debtors' jobs were full-time and Philip Bird worked considerable overtime hours whenever he could to help meet the couple's expenses.

The next turn of events set in motion the Debtors' eventual descent into insolvency. In February 1996, Amy Bird took medical leave of absence from her job and began undergoing psychological counseling. In connection with that counseling, she also began accumulating significant medical expenses none of which was covered by the couple's health insurance. According to Mrs. Bird, she had planned to return to work within a couple of weeks. She was uncertain whether J.C. Penney would continue paying her salary during the medical leave. As it turns out, the company did not. However, instead of returning to work, Mrs. Bird enrolled at the University of Cincinnati as a full-time undergraduate student asserting that this had been recommended by her

counselor. The Plaintiff offered no evidence to contradict this testimony.

In the midst of Amy Bird's personal turmoil, the couple received in the mail two unsolicited "loan finance checks" dated February 15, 1996, in the amount of $2,500 each from the Plaintiff made out to each of them. Evidently, the Plaintiff was embarking upon a new program to offer unsolicited and unsecured signature loans up to $2,500 to potential customers it considered to be good credit risk. Both checks were on official ledger and attached to promissory notes which could be torn away along a perforated edge at the bottom. The solicitation letters accompanying the checks read as follows:

> Star Banc Finance has a solution for tax relief with the attached $2500.00 check. If you don't owe the IRS—you can use this check to consolidate your bills, pay off the 1995 holiday season, take a vacation or for any other use you may have. It's yours to do with as you wish!
>
> Here's all you need to do ... its really quite simple!
>
> 1. Sign the Star Banc Finance Loan Check.
>
> 2. Detach the check and present it along with proper ID to your financial institution.
>
> *There are no other loan papers to sign. Endorsing the* **attached actual check** *does it all. Best of all ... There is* **no prepayment penalty!**

(Plaintiff's Exhibit 3, emphasis in original.)

The Defendants had not approached Star about a loan. They did not complete any application forms or make any representations about their credit worthiness, nor had they ever been customers of the bank before receiving the checks. As it turns out, the Defendants had been preapproved for the loans based solely on a credit scoring system developed by Linda Wesley, a bank employ-

---

1. Since this case involves somewhat novel issues of law which the parties did not adequately address in the pre-trial pleadings, the Court ordered both sides to submit post-hearing briefs. The Plaintiff timely filed its brief, however during the interim, the attorney representing the Defendants, Mr. Gary E. Wolosin, was suspended from practicing law by the Supreme Court of Ohio and by the U.S. District Court, Southern District of Ohio. Unable to afford the fees for another attorney, the Defendants notified the Clerk that they would like for the case to be submitted on the evidence adduced at trial and arguments made by their former attorney.

ee, who they had never met nor had any discussions with regarding a loan.

Wesley developed a set of 25 to 30 scoring criteria and then fed that information to a credit agency in order to determine those eligible to be mailed the bank's unsolicited check loans. On a scale beginning with a perfect score of zero, Star sought individuals for the program who scored between 400 and 800. The Defendants were described by Wesley as "excellent credit risks." Philip Bird achieved a score of 478 and Amy Bird the score of 401. At trial, Wesley was confident of Star's selection process. Wesley stated that in her experience it was highly unlikely that anyone scoring within the desired range would default on this type of loan. As a final observation, Wesley testified that the Defendants had, in fact, obtained the highest score within the sample group of potential customers solicited by the bank during that interval. There is no doubt from Wesley's testimony that the bank was anxious to have both of the Birds as new customers.

To obtain the loan proceeds, the Defendants needed only to endorse the two checks and present them for payment at any financial institution. The Defendants' were contractually obligated to repay the promissory notes by signing the backs of each check where this language appeared:

> By my/our endorsements, I/we acknowledge receipt of the attached Promissory Note and Disclosure Statement payable to Star Banc Finance and agree to be legally bound by the terms and conditions of this Promissory Note.[2]

Approximately two weeks after receiving the checks, Philip Bird quit his job at Drew Nieman Plumbing. This sudden resignation, according to Bird, was prompted by the company's failure to assign to him more overtime work. In fact, Philip Bird testified that he was barely working 40 hours per week when he made the decision to leave the company. He also expressed a need to obtain a higher paying job since his wife was out of work and rapidly accumulating medical bills and other expenses associated with her full-time attendance at college. Unexpectedly, upon his resignation, Drew Nieman Plumbing withheld Bird's final two weeks of salary so that the company could recoup tuition reimbursement payments it had previously made on his behalf. Two or three days after resigning, however, Philip Bird began new employment at Enterprise Vending earning $430 per week, an amount more than he had earned from his former job. None of this evidence was controverted by the Plaintiff.

Defendants were unable, however, to immediately take advantage of Philip's higher wages. Rather, in March, Defendants found themselves in need of funds to cover day-to-day necessities that had already accumulated over February since both had been out of work and neither had received any income. Thus, on March 9 and March 11, 1996, nearly a month after they were mailed, the Defendants cashed both loan checks that Plaintiff had issued and deposited the majority of the funds in the couple's joint checking account.

Consistent with their testimony at a Rule 2004 examination conducted by the Plaintiff's attorney, both Defendants testified that they intended to repay the loans when cashing the checks. At trial, Amy Bird conceded, however, that when they received the two checks in February 1996, they were "struggling financially." She also testified that the couple owed $40,000 in unsecured debts to other creditors along with a mortgage payment. Mrs. Bird, further, admitted that if they had not cashed those checks, she does not know how they would have paid their bills. When asked about their finances in the beginning of March just prior to signing for the loans,

---

2. At trial, the Plaintiff made much of the fact that Amy Bird also answered correspondence addressed to her under her maiden name, Amy Wickersham. However, there was no evidence introduced to suggest that Amy Bird used her maiden name to induce the Plaintiff into extending her credit based upon a false identity. To the contrary, all the evidence suggests that this consideration was irrelevant to the Plaintiff. Star knew exactly with whom it was dealing based on research it had conducted. In fact, Defendant signed her loan check as Amy Wickersham–Bird and that document was admitted into evidence as Exhibit 2. Had the loan in question been collectable, Plaintiff would have encountered little difficulty establishing Amy Wickersham–Bird's liability on this record.

Amy Bird testified that despite their financial condition, "We thought it was going to be okay. We didn't really know, like, until the end of March that we were in trouble." By April 7, 1996, the Birds financial condition had worsened. By then they had also become delinquent on most of their bills.

The first of 36 payments on the bank loans was due April 11, 1996. Not surprisingly, the Defendants failed to make that payment to Plaintiff. Moreover, the Defendants made no attempt to explain their desperate financial condition to anyone at the bank. At the time, the Defendants had a monthly household income .of $1,333.36 and were spending $1,214.00 per month. Thus, the Defendants had no room in their budget to make the minimum payments due on both loans in the amount of $182.88. Three weeks after seeking advice from a bankruptcy lawyer, the Defendants, on May 14, 1996, filed a joint petition under chapter 7 wanting to discharge, among other debts, the Plaintiff's two loans in the total amount of $5,000 plus $130 worth of interest that had accrued at a rate of 16.99% per annum since April 11, 1996.

## CONCLUSIONS OF LAW

The bankruptcy laws do not automatically allow consumers to discharge all their debts. Conversely, certain debts accumulated just prior to filing for chapter 7 relief suffer from a presumption of nondischargeability. In the instant case, the Plaintiff contends that the loans advanced to the Debtors are nondischargeable because they were obtained by false representation or actual fraud. As noted, the relevant Bankruptcy Code sections here are 11 U.S.C. § 523(a)(2)(A) and (C), and these provide as follows:

(a) A discharge under section 727, ... of this title does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . .

(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,000 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable: "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act.

11 U.S.C. § 523(a)(2)(A) and (C).

### The Presumption of Nondischargeability under § 523(a)(2)(C).

We dispose first of Plaintiff's § 523(a)(2)(C) claim. That section provides a presumption of nondischargeability for consumer debts owed to a single creditor and aggregating . more than $1,000 for luxury goods and services incurred by an individual debtor on or within 60 days before the order for relief, or cash advances aggregating more than $1,000 obtained on or within 60 days of the order for relief. Because the cash advance in this case was obtained outside of 60 days before Defendants filed for chapter 7 relief, the presumption under § 523(a)(2)(C) is unavailable.

In the absence of the § 523(a)(2)(C) presumption, a creditor is left with having to prove its case under § 523(a)(2)(A). Thus, we next consider whether the loans in this case are nondischargeable under § 523(a)(2)(A)'s proscription against a debtor obtaining money by "false pretenses, a false representation or actual fraud" from a creditor, and then seeking to have the debt discharged in bankruptcy. The burden of proof in this litigation rests squarely upon the

shoulders of the Plaintiff to show that the Defendants committed fraud to illegally obtain the funds. *Atassi v. McLaren (In re McLaren)*, 990 F.2d 850 (6th Cir.1993); *Blascak v. Sprague (In re Sprague)*, 205 B.R. 851 (Bankr.N.D.Ohio 1997). The rule is also well established in this circuit that to qualify for the fraud exception under § 523(a)(2)(A):

> [T]he creditor must prove the debtor obtained money through a *material misrepresentation* that at the time the debtor knew was false or made with gross recklessness as to its truth. The creditor must also prove the debtor's intent to deceive. Moreover, the creditor must prove that it reasonably relied on the false representation and that its reliance was the proximate cause of loss.

*In re McLaren*, 990 F.2d at 852 (quoting from *Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 932 (6th Cir.1986)).[3] Proof of each of the articulated elements by a preponderance of the evidence is essential to a successful showing that a given debt is nondischargeable. *See Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

When making this determination we are reminded, however, that "[t]he policies underlying the Bankruptcy Code require that exceptions to discharge be construed strictly against creditors and in favor of a fresh start for honest but unfortunate debtors." *F.C.C. Nat'l Bank v. Cacciatore (In re Cacciatore)*, 209 B.R. 609, 613 (Bankr. E.D.N.Y.1997). "If there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *ITT Financial Servs. v. Szczepanski (In re Szczepanski)*, 139 B.R. 842, 844 (Bankr.N.D.Ohio 1991). *Community Mutual Savings Bank v. Landrin (In re Landrin)*, 173 B.R. 307, 310 (Bankr.S.D.N.Y. 1994) ("[E]xceptions to discharge must be literally and strictly construed ... to afford bankruptcy's goal of the economic 'fresh start'.").

### Misrepresentation

The first hurdle the Plaintiff must clear in this litigation is proving that the Defendants obtained money by "false pretenses, a false representation, or actual fraud." § 523(a)(2)(A). There is, in fact, no evidence at all that the Defendants communicated anything orally or in writing to the Plaintiff concerning their credit worthiness to induce the bank to present them with credit, i.e., the loan checks. Initially, it would appear that this first hurdle is legally insurmountable for Plaintiff.

Plaintiff contends, however, that the analytical approach taken by the majority of bankruptcy courts in credit card cases should apply here. That approach recognizes a doctrine of "implied representation" when analyzing whether a debtor made a false representation and had an intent to defraud the card issuer.[4] Because of the factual similarities between credit card cases especially those with preapproved credit lines and this one, we agree with the Plaintiff that a similar standard should apply.

Plaintiff further argues that Defendants' use of the loan checks carried with it fraudulent intent under the implied representation

---

**3.** By holding that " § 523(a)(2)(A) requires justifiable, but not reasonable reliance," the Supreme Court in *Field v. Mans*, 516 U.S. 59, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), overrules *In re McLaren*, 990 F.2d at 851 and *In re Phillips*, 804 F.2d 930, to that extent. We note, however, that unlike the Sixth Circuit most federal courts following the common law fraud example view the elements under § 523(a)(2)(A) in terms of a five part test. *See Cacciatore*, 209 B.R. at 613; *Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1284 (9th Cir.1996). It would appear, however, that our Circuit Court has simply combined the second and first elements (by equating the terms false and representation with misrepresentation) thus reducing the five part test to only four elements.

**4.** *But see GM Card v. Cox (In re Cox)*, 182 B.R. 626 (Bankr.D.Mass.1995), *disapproved of by AT & T Universal Card Serv. Corp. v. Nguyen*, 208 B.R. 258 (D.Mass.1997); *First Card v. Leonard (In re Leonard)*, 158 B.R. 839, 844–45 (Bankr. D.Colo.1993); *AT & T Universal Card Servs. Corp. v. Arroyo (In re Arroyo)*, 205 B.R. 984 (Bankr. S.D.Fla.1997); *AT & T Universal Card Servs. v. Alvi (In re Alvi)*, 191 B.R. 724 (Bankr.N.D.Ill. 1996). Recent decisions from these courts have been outspokenly critical of the emerging doctrine of "implied representation" for various reasons.

doctrine because these Defendants had no ability, nor any intention to repay at the time they cashed the loan checks. In support of its argument Plaintiff relies on the decision in *Central Bank v. Kramer (In re Kramer)*, 38 B.R. 80 (Bankr.W.D.La.1984).

Two schools of thought have evolved on this subject. One line of authority holds that the debtor's use of a credit card carries "an implied representation ... that he has both the means and the intent to pay for the goods." *Signet Bank/Virginia v. Borror (In re Borror)*, 132 B.R. 194, 196 (Bankr. M.D.Fla.1991). Courts adopting this view have concluded that "[t]he use of the credit card is an implied representation to the issuer that the holder has both the *ability* and the *intention* to pay for the purchases and cash advances." *Norwest Bank Des Moines, N.A. v. Stewart (In re Stewart)*, 91 B.R. 489, 494 (Bankr.S.D.Iowa 1988) (emphasis added). That view has found favor in part of Ohio. *May Co. v. Chech (In re Chech)*, 96 B.R. 781 (Bankr.N.D.Ohio 1988) (credit card purchases include an implied representation that the cardholder has the ability and intention to pay for the charge incurred). This approach rightfully has come under severe criticism from other courts leading one to point out, "[g]enerally, people use credit cards because they do not have the present ability to pay. In fact, this is how credit card companies make their profits. [Issuers] charge high interest rates on the unpaid portion of their card-holders' accounts." *Chase Manhattan Bank, N.A. v. Carpenter (In re Carpenter)*, 53 B.R. 724, 728 (Bankr.N.D.Ga. 1985); *see also American Express Travel Related Serv. v. Murphy (In re Murphy)*, 190 B.R. 327, 332 (Bankr.N.D.Ill.1995) ("The court does not agree ... that the use of a credit card is also an implied representation of ability to pay.... But the use of a credit card is a representation of future action."); 4

Lawrence P. King, Collier on Bankruptcy ¶ 523.08 (15th ed. rev.1997) (insolvency or inability to pay is not enough; intent not to pay is needed).

 This Court believes, however, that the better approach is to view the representation as the ability to repay while examining whether the intent to deceive is also present. *See Household Card Servs./Visa v. Vermillion (In re Vermillion)*, 136 B.R. 225 (Bankr. W.D.Mo.1992). Courts have determined that the presentation of a credit card and the signing of the receipt may be fraudulent if the card holder has no ability or intention of repaying the debt. *FCC Nat'l Bank v. Sharp (In re Sharp)*, 144 B.R. 372, 374 (Bankr.S.D.Ohio 1992). The debtor's actual state of mind is determinative. However, a profession by the debtor of intent to repay may be overcome by compelling objective evidence and courts must determine by reviewing the facts on a case by case basis whether debtor instead had the intent to deceive. *See Colonial Nat'l Bank USA v. Leventhal (In re Leventhal)*, 194 B.R. 26, 31 (Bankr.S.D.N.Y.1996) (citing *J.C. Penney Co., Inc. v. Shanahan (In re Shanahan)*, 151 B.R. 44, 47 (Bankr.W.D.N.Y.1993)); *American Express Travel Related Servs. Co. v. McKinnon (In re McKinnon)*, 192 B.R. 768, 776 (Bankr.N.D.Ala.1996).

 In cases such as the one at bar, it is virtually impossible to extract an admission from a debtor that he or she intended to deceive a creditor. Thus, traditionally, courts have examined a variety of objective factors and circumstances to prove the element of deceit.[5] We agree with the court in *Weiss* that subjective intent to defraud must be determined from all the surrounding circumstances in a case, and the decision should not hinge on proof on any one predominant element. *Chase Manhattan Bank v. Weiss*

---

**5.** The enumerated 12 factors which courts traditionally examine to discover whether by circumstantial evidence, objective proof of deceit has been shown are as follows: 1) the length of time between the charges made and petition filing; 2) whether or not an attorney was consulted about filing bankruptcy before the charges were made; 3) the number of charges made; 4) the amount of charges; 5) the financial condition of the debtor when the charges were made; 6) whether the charges exceeded the line of credit; 7) whether multiple charges were made in one day; 8) whether or not the debtor was employed; 9) the prospects for debtor's employment; 10) financial sophistication of the debtor; 11) whether there were any sudden changes in buying habits; and 12) whether luxury items or necessities were purchased. *See Weiss*, 139 B.R. at 930; *Sharp*, 144 B.R. at 374.

*(In re Weiss)*, 139 B.R. 928, 930 (Bankr. D.S.D.1992). Although this is a close case, from all the facts and testimony presented, we cannot conclude that the Defendants intended to deceive this Plaintiff when making use of the loan checks that were sent to them unsolicited through the mails.

It is evident that the Defendants only reluctantly took advantage of the Plaintiff's credit extension when it was clear that their economic circumstances were in dire straits. The couple's use of these funds when they had no present ability to repay did not mean necessarily that there was never any intention to repay in the future. The couple's actions after cashing the loan checks belie the creditor's accusation that they did not intend to repay. Philip Bird realizing the need to make up for the loss of his wife's income and the rise in their expenses created by her medical treatments and college bills, sought and obtained a higher paying job. During this period, the couple's monthly expenses were just shy of their monthly income. Moreover, as a plumber, Philip Bird was accustomed to having numerous overtime work opportunities which tended to generate additional income. It was not unrealistic to believe that through overtime pay he could make up for the short fall in the couple's budget. Neither were the Defendants reckless when it came to their financial affairs. Indeed, the bank's own evidence adduced at the hearing demonstrated that both were financially responsible individuals with whom the bank obviously desired to do business. They paid their bills on time while maintaining a nonextravagant lifestyle. Defendants used the check loans obtained from the Plaintiff at a time when they were in the middle of changing careers and when their finances were in crises, fully intending to repay their obligations. However unrealistic their expectations were, the Birds believed when they signed the checks that the grace period of one month afforded them sufficient time to get back on their feet. Even though it was brought out that Amy Bird had worked as a collection agent for J.C. Penny, we cannot conclude from her statements and demeanor on cross examination that she had any particular sophistication regarding the bankruptcy laws or the couple's prospects of obtaining a discharge of Plaintiff's debts under those laws. The evidence does not suggest the couple preplanned a bankruptcy.

Moreover, both Defendants testified that they made no more purchases than normal during the month that elapsed after cashing the Plaintiff's $5,000 loan checks. The evidence showed that most of the proceeds were deposited into the couple's joint checking account. The Defendants later made 19 purchases accounting for $4,507.35 of those funds. Most the proceeds from the loans went towards everyday expenses. The bank did not present any evidence to contradict the Defendants' testimony and corroborating physical evidence. Canceled checks were introduced at trial which proved that the proceeds from the checks were spent, for the most part, on utilities, groceries, household items, medical bills, previous school loans, college expenses and tuition including books and supplies, three months of alarm security services, a mortgage payment, credit card debt at Sam's Club, a wedding album and veterinarian fees. The only suspect expenditures that Defendants made during this period involved the decision to make an advance payment on one year's car insurance, the purchase of the wedding album and veterinarian services. When questioned about the expenditure for car insurance, however, Amy Bird testified that the prepayment on the insurance alleviated one monthly expense of $120 per month thus permitting the couple to manage more easily within their monthly budget. Although this reasoning may not be very sophisticated financial planning, the couple was apparently trying to use the loan checks in a manner they felt would best help them with their monthly budget. The wedding album purchased for $441.96 and the veterinarian fees of $93.40 fall clearly within the category of luxury goods and services. Neither of these qualify as expenditures for the maintenance and support of the Debtors or their dependents. We believe, however, the Birds spent the proceeds from the loan checks in anticipation of generating enough earnings to repay them. That expectation was not unreasonable in light of the sincere efforts that were made by the Defendants to alleviate their financial problems in order to

meet those obligations. It was only when the Defendants realized that they could not possibly service all their debts, including the continuing unanticipated expenses associated with Amy Bird's medical care, that they turned to bankruptcy as a solution.

Defendants were not out to deceive this Plaintiff. Plaintiff extended them credit relying on its own research concerning the Defendants' credit history. It happened that the bank's decision in this case was both unwise and unprofitable because of a change in circumstances which the bank did not foresee but could have easily discovered had it conducted even a minimal investigation of the Birds' financial affairs before actually mailing the check loans to them. "Although, through hindsight, this extension of credit was unwise, it does not make the debt nondischargeable." *Carpenter,* 53 B.R. at 729.

"Consistent with the 'fresh start' objectives of the Bankruptcy Code, ... exceptions to discharge must be literally and strictly construed against the creditor and liberally in favor of the debtor." *Leventhal,* 194 B.R. at 28. The Court cannot say that Defendants had the subjective intent to deceive this creditor when cashing the loan checks in this case. We find that the Plaintiff failed to prove the first element—that the Defendants made a false representation—thus the Court does not need to consider the other of the four elements articulated by the Sixth Circuit as they are moot.

■ We note in passing, however, an alternative basis for rejecting the Complaint in this case. "No one, of course, doubts that some degree of reliance is required to satisfy the element of causation inherent in the phrase 'obtained by,'" expressed in § 523(a)(2)(A). *Field,* 516 U.S. at 66, 116 S.Ct. 437. "Both actual and justifiable reliance are required." *Id.* at 70, 116 S.Ct. 437 (quoting Restatement (Second) of Torts (1976) § 540). There is no proof in this case of the presence of either "actual" or "justifiable" reliance. Here, the Plaintiff tendered loan checks to these Defendants by putting faith of their credit worthiness in the reports from a credit agency and the interpretation of those reports offered by its own employee, alone. Thus, the decision to extend credit

had been reached by the Plaintiff long before the Defendants ever received the loan checks. Nothing that the Defendants could have said or done would have altered that result. *See Greenfield State Bank v. Copeland,* 330 F.2d 767 (9th Cir.1964) (There was no reliance in fact because the loan was granted before the representation, the submission of a financial statement, was made.)

Primarily, the Plaintiff relied upon a lending practice, which in our view stretches the limits of reasonable conduct. Even if there were implied misrepresentations by these Defendants in this case, they were so remote from the decision to extend credit as to render them ineffectual. As the Supreme Court observed:

> As for the reasonableness of reliance, our reading of the Act does not leave reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact. Naifs may recover, at common law and in bankruptcy, but lots of creditors are not at all naive. The subjectiveness of justifiability cuts both ways, and reasonableness goes to the probability of actual reliance.

*Field,* 516 U.S. at 76, 116 S.Ct. 437.

The Plaintiff's inability to prove reliance invalidates its assertion that the loans under consideration are nondischargeable. To hold otherwise would render the phrase "obtained by" expressed in § 523(a)(2)(A) meaningless, which the Supreme Court in *Field* has indicated that a bankruptcy court must not do.

Accordingly, Plaintiff's Complaint is **OVERRULED.** This decision constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. Appropriate orders will be entered.

**IT IS SO ORDERED.**