**In re THANH V. TRUONG, Debtor.**

**American Express Centurion Bank, Plaintiff,**

v.

**Thanh V. Truong, Defendant.**

**Bankruptcy No. 01–32242(LMW).**
**Adversary No. 01–3112(LMW).**

United States Bankruptcy Court, D. Connecticut.

Jan. 11, 2002.

---

Steven W. Varney, Brown, Paindiris & Scott, LLP, Glastonbury, CT, for plaintiff.

Thanh V. Truong, Hamden, CT, defendant pro se.

## *MEMORANDUM OF DECISION RE: MOTION FOR ENTRY OF DEFAULT JUDGMENT*

LORRAINE M. WEIL, Bankruptcy Judge.

The matter before the court is American Express Centurion Bank's ("American Express") Motion For Entry of Default Judgment (Doc. I.D. No. 7, the "Motion") pursuant to which American Express seeks entry of judgment against the above-captioned debtor (the "Debtor") to the effect that a $4,749.58 credit card debt owing to American Express is nondischargeable pursuant to Bankruptcy Code § 523(a)(2).[1]

### I. PROCEDURAL BACKGROUND

The Debtor commenced this chapter 7 case by petition filed on May 1, 2001 (the "Petition Date"). August 6, 2001 was set as the last date upon which complaints seeking a determination of the nondischargeability of certain claims (including Section 523(a)(2) claims) could be timely filed. The Debtor received his chapter 7 discharge on August 21, 2001.

On August 2, 2001, American Express filed the complaint (the "Complaint") that initiated this adversary proceeding. The Debtor is *pro se* in this proceeding and has failed to plead or otherwise defend.[2] In response to a motion filed by American Express (Doc. I.D. No. 5), the Clerk entered a default against the Debtor herein on October 23, 2001 (Doc. I.D. No. 6). American Express filed the Motion on November 7, 2001. The Motion was supported by, among other things, the Affidavit of American Express Centurion Bank in Support of Its Motion For Entry of Default Judgment (included in Doc. I.D. No. 7, the "Affidavit"). A hearing on the Motion on notice to the Debtor was held on November 28, 2001. The Debtor did not attend that hearing. At the conclusion of the hearing, the court took the matter under advisement. After due deliberation, the court is now prepared to issue this memorandum of decision.

### II. DEFAULT JUDGMENT STANDARD

Entry of judgment by default is controlled by Rule 55 of the Federal Rules of Civil Procedure (made applicable here by Rule 7055 of the Federal Rules of Bankruptcy Procedure). A debtor who is named as a defendant in an adversary proceeding that arises in the bankruptcy case is always deemed to have appeared in the adversary proceeding for purposes of Rule 55(b)(2) of the Federal Rules of Civil

---

1. This is a core proceeding within the purview of 28 U.S.C. § 157(b).

2. The Debtor is represented by counsel in the chapter 7 case.

Procedure. *Batstone v. Emmerling (In re Emmerling)*, 223 B.R. 860, 867 (2d Cir. BAP 1997). *See also* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2686 at 45 (3d ed.1998) (hereafter, "*Wright, Miller & Kane*") ("[I]n order to ensure defendant an opportunity to defend against plaintiff's application, a court usually will try to find that there has been an appearance by defendant, which has the effect of requiring that notice of the application for a default be given.").

■■■■ Although the Debtor has failed to plead, a motion for judgment by default is not granted as a matter of right. Rather, the court in its discretion may conduct a hearing "requir[ing] some proof [from the Plaintiff] of the facts that must be established in order to determine [the Debtor's] liability." *Wright, Miller & Kane* § 2688 at 60–61. *See also Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir.1993) ("[A]s a general rule a ... court should grant a default judgment sparingly ... when the defaulting party is appearing *pro se* "). At the court's discretion, such proof may be made by affidavit. *See* Fed. R.Civ.P. 43(e) (made applicable here by Fed.R.Bankr.P. 9017). Further, "where the allegation is one of fraud, it is appropriate that the court [evaluate] ... the evidence to insure that the drastic remedy of a determination of nondischargeability is not entered without the presentation of a prima facie case." *United Counties Trust Co. v. Knapp (In re Knapp)*, 137 B.R. 582, 585 (Bankr.D.N.J.1992). *See also General Electric Capital Corp. v. Bui (In re Bui)*, 188 B.R. 274, 276 (Bankr. N.D.Cal.1995) ("A plaintiff must demon-strate a *prima facie* case by competent evidence in order to obtain a [d]efault [judgment]."). A plaintiff has made a satisfactory prima facie showing where, from the evidence presented, "a factfinder could reasonably find every element that the plaintiff must ultimately prove to prevail in the action." *Fisher v. Vassar College*, 114 F.3d 1332, 1336 (2d Cir.1997) (*en banc* ), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 and *reh'g denied*, 523 U.S. 1041, 118 S.Ct. 1341, 140 L.Ed.2d 501 (1998) (*abrogated on other grounds by Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

### III. FACTUAL BACKGROUND

The following "facts" have been either gleaned by the court from the Debtor's bankruptcy schedules and Statement of Financial Affairs filed with this court (included in Doc. I.D. No. 1, collectively, the "Schedules") or American Express has made *prima facie* proof of the same pursuant to the Affidavit.[3] Accordingly, the following "facts" are deemed established for the purposes of this memorandum.

On or about October 16, 1999, the Debtor completed an application (the "Application") for a "preapproved" American Express Blue Card (the "Card"). In the Application, the Debtor represented yearly income of $40,000.00 and "Additional Personal Income" (from employment as a "temp") of $9,600.00. (Affidavit ¶ 35 and Exhibit B.) The Debtor returned the Application to American Express who (after a credit check) issued the Card to and opened a corresponding account (the "Account") for the Debtor sometime in Octo-

---

**3.** Such proof includes Exhibits A and B which are annexed to the Affidavit. Exhibit A ("Exhibit A") is comprised of copies of account statements relating to the subject American Express account for the periods of January 3, 2001 through (and including) April 3, 2001. Exhibit B ("Exhibit B") is a copy of the Debtor's application for the Card (as hereafter defined).

ber, 1999. (Affidavit ¶ 7.) [4] At all relevant times, the "Total Credit Line" available to the Debtor in respect of the Account was $2,000.00. (Exhibit A.)

For the Period from at least April of 2000 through January 6, 2001, the Debtor apparently used the Card without incident and made regular payments thereon equal to or exceeding the required minimum monthly payment. (*See* Affidavit ¶ 28.) [5] On the Account statement "closing date" of January 3, 2001, the Account balance was $1,338.74 and the Account was not in default. (*See* Exhibit A.) From January 7, 2001 through January 30, 2001, the Debtor incurred approximately $625.00 in charges as a result of what appears to be relatively unexceptional Card use. (*See id.*) The Debtor then commenced what can best be described as a singular seven-day period (the "Relevant Period") described immediately below.

On January 31, 2001, a purported payment (the "First Payment") by check in the amount of $1,828.60 was posted to the Account. (Exhibit A.) On February 1, 2001, the following charges were posted against the Account: a $404.58 charge at Home Depot for "building supplies"; a second charge at Home Depot in the amount of $442.32 also for "building supplies"; and a cash advance in the amount of $313.99 at the Mohegan Sun Resort Casino in Uncasville, Connecticut. (*Id.*) On February 2, 2001, the following charges were posted against the Account: a $582.99 charge at Circuit City for "elec-

tronics/appliances"; and a $54.53 charge at Petco for "pets/supplies". (*Id.*) On February 3, 2001, a $61.25 cash advance was charged against the Account. (*Id.*) On February 4, 2001, the First Payment was reversed because the Debtor's check was returned by the payor bank for insufficient funds. (Affidavit ¶ 19 and Exhibit A.) However, on the same date, a purported payment (the "Second Payment") in the amount of $1,952.67 was posted to the Account. The source of the Second Payment was a "phone payment using Express Cash". (*Id.*) [6] On February 6, 2001, the following charges were posted against the Account:

| Charge Amount | Description |
| --- | --- |
| $500.00 | charge for "food/beverage" at Ming Palace |
| $300.94 | charge for "Coach handbags" at Macy's at Herald Square New York |
| $860.59 | charge for "fine watches" at Macy's at Herald Square New York |
| $ 31.73 | charge for "building supplies" at Home Depot |
| $100.00 | cash advance (New York) |
| $ 62.00 | cash advance (New York) |

(Exhibit A.) Slightly more than a week after the conclusion of that singular week (on February 14, 2001), the Second Payment was reversed with the notation "returned check/declined bank transactions". (*Id.*) The Debtor never purported to make another payment on the Account. As of the Petition Date, the balance on the Account was $5,997.24 (*see* Affidavit ¶ 9),

---

4. At about the same time, American Express forwarded a copy of the agreement governing the Account to the Debtor. (*See* Exhibit B.) A copy of that agreement is not in the record.

5. In fact, during that period, the Debtor appears actually to have used the Card only during the calendar months of July, 2000 ($468.89), December, 2000 ($604.86) and January, 2001. However, he made payments each month during the referenced period in

the amount of $100.00 (except for the month of May, 2000 when he made a $200.00 payment). (*See* Affidavit ¶ 28 and Exhibit A.) Accordingly, it is assumed that the Account had some balance owing on it as of the beginning of April, 2000.

6. "Express Cash" apparently is another American Express program the nature of which is not described in the Affidavit.

$3,714.92 [7] of which was incurred during the Relevant Period. On the Account statement "closing date" of February 4, 2001, the Account was $1,856.78 over the credit limit (giving effect to the cancellation of the First Payment). (*See* Exhibit A.) On the statement "closing date" of March 4, 2001, the Account was $3,859.21 over its credit limit. (*Id.*)

As noted above, the Debtor commenced this case less than ninety days later. The record does not disclose when the Debtor first contacted an attorney to discuss the commencement of this case. In his sworn Schedules, the Debtor declared that he had no current income as of the Petition Date and stated that he did not expect any improvement in that situation during the upcoming year. (*See* Schedules (Schedule I—Current Income of Individual Debtor(s)).) [8] The Schedules further stated that the Debtor had had no income for the period January 1, 2001 through the Petition Date, no income for calendar year 2000, and (perhaps) $5,000 in income for calendar year 1999. (*See* Schedules (Statement of Financial Affairs, Item 1,

2).) [9] In the Schedules, the Debtor listed assets totaling approximately $85,000 in value,[10] no secured or priority claims and approximately $140,000 in general unsecured claims.[11] (*See* Schedules.)

## IV. NONDISCHARGEABILITY

■ Bankruptcy Code § 523(a)(2)(A) excepts from discharge "any debt—for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud...." 11 U.S.C.A. § 523(a)(2) (West 2001).[12] To prove a prima facie case under Bankruptcy Code § 523(a)(2)(A), American Express must make the required showing with respect to the following elements: (1) the Debtor made representations; (2) knowing them to be false; (3) with the intent and purpose of deceiving American Express; (4) upon which representations American Express actually and justifiably relied; and (5) which proximately caused the alleged loss or damage sustained by American Express. *See AT & T Universal Card Services v. Mercer (In re Mercer)*, 246

---

**7.** plus related late fees, over-advance fees and other charges in an uncalculated amount (collectively, "Other Charges").

**8.** The Debtor also stated that he had no current expenditures as of such date. (*See* Schedules (Schedule J—Current Expenditures of Individual Debtor(s)).) Based upon the Schedules, the Debtor does not appear to have a spouse or dependents. (*See* Schedules.)

**9.** The Statement is not clear on the last point and it may, indeed, recite a negative $5,000.

**10.** That figure may have been overstated by $41,720.00 as it includes the *entire* $83,440.00 stated value of a piece of real property as to which the Debtor appears to claim only a one-half interest. (*Compare* Schedules (Schedule A—Real Property) *with* Schedules (Schedule C—Property Claimed as Exempt).)

**11.** Except for a $17,600.00 "Credit Advance" debt to Mohegan Sun Resort Casino and a

$5,800.00 "Credit Advance" debt to Foxwoods Resort Casino, the Debtor's general unsecured claims appear to consist primarily of credit card debts. (*See* Schedules (Schedule F—Creditors Holding Unsecured Nonpriority Claims).) In the Schedules, the Debtor swore that he had had no gambling losses during the year prior to the Petition Date. (*See* Schedules (Statement of Financial Affairs, Item 8).)

**12.** The Motion also seeks entry of judgment by default on a Section 523(a)(2)(B) theory. The court deems American Express' default judgment showing on its Section 523(a)(2)(B) theory to be so inadequate as not to merit discussion here and the Motion shall be denied in that respect. However, American Express' right to proceed to trial on that theory (should a trial in this proceeding prove necessary) is hereby preserved.

F.3d 391, 403 (5th Cir.2001) (*en banc*); *Rosenblit v. Kron (In re Kron)*, 240 B.R. 164, 165 (Bankr.D.Conn.1999) (Krechevsky, J.). Exceptions to discharge must be strictly construed in favor of the Debtor in order to effectuate the fresh start policy of bankruptcy. *Kron*, 240 B.R. at 165. Furthermore, the "[D]ebtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immortality) is insufficient." *Id.* at 165–66 (citation and internal quotation marks omitted).

### A. Representation, Falsity of Representation and Intent to Deceive

 Although the dischargeability of credit card debts pursuant to Bankruptcy Code § 523(a)(2)(A) has produced vast amounts of discussion both in caselaw and treatises, that issue has not yet been addressed by the Court of Appeals for the Second Circuit. Generally, "courts hold credit card debts to be dischargeable absent a determination that the debtor did not intend to pay the charges when they were incurred." *AT & T Universal Card Services Corp. v. Williams (In re Williams)*, 214 B.R. 433, 435 (Bankr. D.Conn.1997) (Krechevsky, J.). Each use of a credit card is a representation of an intent to pay[13]. *See Mercer*, 246 F.3d at 406; *AT & T Universal Card Services Corp. v. Harrington (In re Harrington)*, Ch. 7 Case No. 97–32109, Adv. No. 97–3197, slip. op. at 9 (Bankr.D.Conn. Oct. 4, 2001) (Dabrowski, J.). *Accord In re Rembert*, 141 F.3d 277, 281; *In re American Express Travel Related Services Co., Inc. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1126 (9th Cir.), *cert. denied*, 520 U.S.

1230, 117 S.Ct. 1824, 137 L.Ed.2d 1031 (1997). *See also Bank of America v. Jarczyk (In re Jarczyk)*, 268 B.R. 17, 21 (W.D.N.Y.2001) ("By far, the majority of courts have adopted what is sometimes termed the 'implied representation' theory, which holds that each time a cardholder uses his credit card, he impliedly represents to the issuing bank that he intends to repay the debt incurred."). That is so because a representation may be made either through spoken words or, in the context of a credit card, implied through conduct. *Mercer, supra* at 406–07.

The court hereby adopts the majority view "implied representation" theory. Accordingly, the court must determine whether American Express has made a prima facie case of the Debtor's subjective intent with respect to payment of the subject debt. If a representation of an intent to pay is made (through use of a credit card), such a representation is "false if there is use *without* that intent." *Id.* at 408 (emphasis in original). *See also In re Anastas*, 94 F.3d 1280, 1286 ("The correct inquiry is whether the debtor either intentionally or with recklessness as to its truth or falsity, made the representation that he intended to repay the debt.").

 Because intent to defraud is rarely proved by direct evidence, a majority of courts have utilized the "totality of the circumstances" approach (which this court hereby adopts) to discern a debtor's subjective intent by applying the following non-exhaustive list of objective factors (as enumerated by the court in *Citibank South Dakota N.A. v. Dougherty (In re Dougherty)*, 84 B.R. 653, 657 (9th Cir. BAP 1988)) (*abrogated on other*

---

**13.** but not of the financial ability to pay. *See Mercer*, 246 F.3d at 404–05. *Accord Rembert v. AT & T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.), *cert. denied*, 525 U.S. 978, 119 S.Ct. 438, 142

L.Ed.2d 357 (1998); *Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir.1996). *Cf. American Express v. Kahn (In re Kahn)*, 261 B.R. 365 (Bankr.D.Conn. 2001) (Shift, C.J.).

*grounds by Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)):(1) time elapsed between the charges and the bankruptcy filing; (2) whether the debtor consulted an attorney with respect to the filing of bankruptcy prior to incurring the subject charges; (3) number and amount of charges; (4) financial condition of debtor when charges were incurred; (5) if the charges exceeded the credit limit; (6) if multiple charges were incurred on the same day; (7) if the debtor was employed (and if not, the debtor's prospect for employment); (8) the debtor's financial sophistication; (9) if there were any sudden changes in the debtor's spending habits; and (10) if charges were made for the purchase of luxury items or necessities. The foregoing factors, together with any other pertinent facts and circumstances, "may provide sufficient circumstantial evidence for a court to infer that a debtor intended, at the time the debt was incurred, not to pay it." *Universal Bank, N.A. v. Owen (In re Owen)*, 234 B.R. 857, 860 (Bankr. D.Conn.1999) (Krechevsky, J.). *See also In re Rembert*, 141 F.3d at 282 (("What courts need to do is determine whether all the evidence leads to the conclusion that ... the debtor had the requisite fraudulent intent.") (citation and internal quotation marks omitted)). In determining the requisite intent, the court may also consider a debtor's ability to pay the subject charges at the time they were incurred.[14]

■ With respect to Card use [15] before the Relevant Period, the evidence presented by American Express is insufficient so that this court concludes that American Express has failed to make a prima facie case with respect to the Debtor's lack of intent to pay charges incurred during that earlier period. The Debtor's Card use during that earlier period was unremarkable, did not necessarily include charges for luxury items and did not exceed the Card's credit limit. Moreover, the Debtor regularly made payments equal to or exceeding the minimum monthly payment [16] (notwithstanding the lack of income stated in the Schedules) and there is no proof of when the Debtor first discussed bankruptcy with an attorney.

However, charges incurred during the Relevant Period stand on a different footing. The Debtor's spending habits changed drastically during that period (*i.e.*, there was heavy Card use). There were substantial charges for luxury items and multiple charges were incurred on the same day. There were two "payments" made during that period (one "payment" replacing the other), each made not in

---

**14.** Analysis of several of the *Dougherty* factors invokes an "ability to pay" analysis in the context of proof of intent not to pay. (*See, e.g.*, factors 4, 7 and 8, *supra*.) A debtor's lack of ability to pay "*may* support finding the debtor did *not* intend to pay, but *only* if she was aware of her financial condition and knew she *could not* (and therefore did *not* intend to) make even the minimum monthly payment to the issuer." *Mercer*, 246 F.3d at 409 (emphasis in original). *See also id.* (("If the debtor has *no* idea how the money will get paid back, or if it will get paid back, then he may hope to repay—he may even want to repay—but he certainly does *not* intend to repay.") (emphasis in original) (citation and internal quotation marks omitted)). *See also Citibank·(South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1090 (9th Cir.1996) (("A substantial number of bankruptcy debtors incur debts ·with hopes of repaying them that could be considered unrealistic in hindsight. This by itself does not constitute fraudulent conduct warranting nondischarge.") (citation and internal quotation marks omitted)).

**15.** As used herein, the term "Card use" includes cash advances.

**16.** until he began to make "payments" not in good funds

good funds. The balance of the Account far exceeded the Account credit limit (which it apparently had not done at any prior time). Furthermore, the Debtor was unemployed during the Relevant Period and he filed bankruptcy less than ninety days from the end of the Relevant Period. Given the Debtor's financial condition at the time and the abrupt shift in Card use and payment practice, a reasonable finder of fact could draw the inference that (whatever the source of previous Account payments) the Debtor was aware that he did not have the ability to pay the American Express debt that he was incurring during the Relevant Period and at the time it was incurred did not intend to make any payment in respect of such debt. In sum, based on all the facts and circumstances in respect of the Relevant Period, a reasonable finder of fact could find that American Express has made a prima facie showing on the issues of falsity of representation and intent to deceive with respect to the Relevant Period. *See Mercer*, 246 F.3d at 410–11 (("With card-use, and the concomitant representation of intent to pay, the cardholder's intent is for the creditor, in reliance on that representation [of intent to pay], to approve the requested loan. Accordingly, *if* the bankruptcy court finds that, by card-use, [the cardholder] ... made a knowingly false representation of intent to pay, then the separate requisite *intent to deceive* is also present.") (emphasis in original) (citation and footnote omitted)).

### B. *Reliance and Causation*

■■■■ American Express must make a prima facie case that it relied upon the Debtor's misrepresentation and that such reliance was both actual and justifiable. *Mercer*, 246 F.3d at 411. A showing by American Express that "it would *not* have approved the loan [i.e., charges incurred] in the absence of debtor's promise [or

representation] to pay (through card-use)" establishes actual reliance. *Id.* at 415 (emphasis in original). The focus of the justifiable reliance inquiry "should be on whether [American Express] ..., based on its credit screening and its relationship with [the Debtor] ... during [his] ... card-use, had reason to believe [he] ... would *not* carry out [his] ... representation, through card-use, of intent to pay." *Id.* at 423 (emphasis in original). *See also In re Anastas*, 94 F.3d at 1286 ("[T]he credit card issuer justifiably relies on a representation of intent to repay as long as the account is not in default and any initial investigations into a credit report do not raise red flags that would make reliance unjustifiable."). American Express has made the required showing of actual reliance on the Debtor's representation of intent to pay (*See* Affidavit ¶ 30.) However, American Express has not made the required showing that such reliance was "justifiable", the Affidavit offering only conclusory statements and on its face raising issues in that regard. Accordingly, the Affidavit fails to establish that American Express did not have "reason to believe [that] ... [the Debtor] would *not* carry out [his] ... representation, through card-use, of intent to pay," *Mercer*, 246 F.3d at 423, during the Relevant Period. Although the foregoing is an issue with respect to the First Payment and the subsequent cancellation thereof, it is a more serious issue with respect to the Second Payment and its subsequent cancellation. That is because the Second Payment was made by "Express Cash" which appears to be an American Express program. Therefore, the declination of the "Express Cash" payment raises the issue of what American Express knew about the Debtor's financial condition during the Relevant Period, and when American Express knew it. At a minimum, to

make a prima facie case, American Express would need to (1) explain satisfactorily how the returned check process worked (including timing) with respect to the First Payment, and (2) explain satisfactorily the "Express Cash" program and how the "Express Cash" declination process worked (including timing) with respect to the Second Payment.[17]

## V. CONCLUSION

For the reasons discussed above, the court has determined that the Motion cannot be granted at this time. However, an order will issue scheduling a further hearing on the Motion. At that further hearing, American Express may elect either: (1) to present testimony and other evidence to establish its prima facie case on the element of "justifiable reliance" (and to quantify the amount of the Other Charges) or (2) to declare its desire to proceed to trial on one or both counts of the Complaint (in which case an amended pretrial order will be required and a new trial date will be set).

**17.** If American Express makes a prima facie case as to its justifiable reliance on the Debtor's misrepresentation of intent to pay, as a matter of law it also would make a prima facie case that its loss was proximately caused by such reliance. *See Mercer,* 246 F.3d at 425.