In re Tawgih OLWAN, Debtor.

Citibank (South Dakota), N.A., Plaintiff,

v.

Tawgih Olwan, Defendant.

Bankruptcy No. 03–23366–ess. Adversary No. 03–01695–ess.

United States Bankruptcy Court, E.D. New York.

July 12, 2004.

Tawgih Olwan, Staten Island, NY, pro se.

### MEMORANDUM DECISION DENYING THE MOTION OF CITIBANK (SOUTH DAKOTA), N.A. FOR DEFAULT JUDGMENT

ELIZABETH S. STONG, Bankruptcy Judge.

Before the Court is the motion for default judgment (the "Motion") of Citibank (South Dakota), N.A. ("Citibank"), in the above-captioned adversary proceeding (the "Adversary Proceeding"). Citibank filed a complaint (the "Complaint") commencing this Adversary Proceeding against the debtor, Tawgih Olwan (the "Defendant") on December 17, 2003.[1] The Complaint seeks a finding that certain credit card debt owed to Citibank by the Defendant is nondischargeable, under Section 523(a)(2)(A) of the Bankruptcy Code, on grounds that the Defendant obtained the extension of credit through fraud, false pretenses, and false representations. Citibank also seeks a judgment in the amount of $1,857.47 plus interest to compensate it for its damages arising from the alleged fraud.

Pre-trial conferences in this Adversary Proceeding were held on February 24, 2004, and March 26, 2004. At the March 26, 2004, conference, the Court noted the Defendant's default on the record. Docket, Case No. 04–01695, March 26, 2004, Entry. On April 20, 2004, Citibank filed this Motion. A hearing was held on April 29, 2004 (the "Hearing"), at which counsel for Citibank appeared and was heard.

---

1. When this Adversary Proceeding was commenced, the Defendant was represented by counsel, and Citibank served the Complaint on both the Defendant and his counsel. By motion dated February 6, 2004, the Defendant's counsel sought leave to withdraw as the Defendant's counsel. By memorandum decision and order dated April 6, 2004, the motion to withdraw was granted, on grounds, among others, that the Defendant refused to cooperate with counsel. *See* Docket, Case No. 03–23366, Entries 9 and 10 (Memorandum Decision and Order granting motion to withdraw).

The Defendant did not appear at either pre-trial conference, serve an answer to the complaint, submit written opposition to the Motion, or appear at the Hearing to oppose the Motion. After consideration of the record and the relevant factors, the Motion is denied for the reasons set forth below.

## I. JURISDICTION

The Court has jurisdiction to hear this adversary proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The following constitutes the Court's findings of fact and conclusions of law.

## II. BACKGROUND

The Defendant filed a petition (the "Petition") for relief under chapter 7 of title 11 (the "Bankruptcy Code") on October 14, 2003 (the "Petition Date"), and received a discharge on February 24, 2004. The Defendant's Petition lists monthly income of $1,500 and monthly expenses of $2,543. Petition, Schedules I and J. The Petition further shows that the Defendant had income of $20,754 in 2002, and income of $12,000 for the first nine months of 2003. Statement of Financial Affairs, Item 1. The Defendant lists $39,925 in unsecured nonpriority debt, and $19,725 of that amount is owed to Citibank arising from the credit account in question. Petition, Schedule F. The Complaint seeks a determination that $1,857.47 of this amount is nondischargeable, and a judgment in that amount plus interest. Complaint, ¶ 9.

Citibank alleges that, until May 2003, the Defendant regularly incurred charges and made payments on the account. Complaint, ¶ 7. Citibank asserts, and the record reflects, that the Defendant made two charges, on May 3, 2003, at EZ Tobacco in the amount of $267.47 and on May 11, 2003, at EZPass Prepaid Toll in the amount of $90, and took a $1,500 cash advance on June 10, 2003. Complaint, ¶ 7; see Motion, Exhibit (credit card statements for May 22, 2003, and June 24, 2003, closing dates). The record also reflects that during the May and June 2003 billing cycles, the Defendant did not make a minimum payment of $410, due on June 16, 2003. Complaint, ¶ 7. The record does not show that the Defendant failed to make any prior minimum payments on his account. See Motion, Exhibit (credit card statements for May 22, 2003, and June 24, 2003, closing dates).

Citibank asserts that these amounts are nondischargeable because "[t]he Defendant obtained the credit under false pretenses and false representations." Complaint, ¶ 8. Citibank argues that "[t]he use of the account by the [Defendant] is an express and implied representation that the [Defendant] has the intent and wherewithal to pay for the extended credit in accordance with the underlying credit terms." Complaint, ¶ 8. Citibank further states that several factors indicate that the Defendant had an intent to defraud, including:

a. The [Defendant] accessed the personal property over a short period.

b. No payment was made toward the charges.

c. Charges included luxury items and a large sum of cash.

d. The [Defendant] owns no real property and therefore no equity exists to access to pay creditors.

e. The [Defendant] has no personal property with value to liquidate to pay creditors.

f. The [Defendant] shows insufficient income on Schedule I to pay fixed expenses on Schedule J let alone credit debt of $40,000.

g. Although not filed until October 14, 2003, the [Defendant] spoke with the

Bank representatives on August 27, 2003 and advised [he] was filing bankruptcy. [He] provided [his] attorney name of Hanna & Vlahakis [sic]. Thus the bankruptcy and non payment intent is far closer to the advances than appears from the actual filing date.

Complaint, ¶ 8. For these reasons, Citibank argues that it is entitled to a finding that these three charges are not dischargeable, and a judgment in the amount of $1,857.47, plus interest.

## III. DISCUSSION

### A. The Standard for Default Judgment

■ In this Circuit, "a debtor named as defendant in an adversary proceeding in his own bankruptcy case is always deemed to have 'appeared' in the adversary proceeding so as to require notice of a motion for a default judgment." *Batstone v. Emmerling (In re Emmerling)*, 223 B.R. 860, 867 (2d Cir. BAP 1997). A default occurs if the defendant does not respond to the complaint within thirty days after the issuance of the summons. *See* Fed. R. Bankr.P. 7012(a) (requiring an answer within 30 days of the issuance of the summons). Here, the summons was issued on January 7, 2004, and no answer has been filed. Docket, Case No. 03–01695, Entry 2. Therefore, under Bankruptcy Rule 7055, Citibank may move for a default judgment. *See Nickolas v. Boccio (In re Boccio)*, 281 B.R. 171, 174 (Bankr.E.D.N.Y.2002) (discussing the procedural requirements in adversary proceedings).

Bankruptcy Rule 7055 incorporates Federal Rule of Civil Procedure 55, which provides:

the party entitled to a judgment by default shall apply to the court therefor ... If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to

determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary and proper.

Fed.R.Civ.P. 55(b)(2); *see* Fed. R. Bankr.P. 7055.

■ The Defendant's failure to answer the Complaint does not, standing alone, entitle Citibank to judgment. *See In re Boccio*, 281 B.R. at 174 (non-defaulting party not entitled to default judgment as a matter of right); *American Express Centurion Bank v. Truong (In re Truong)*, 271 B.R. 738, 742 (Bankr.D.Conn.2002) (default is not granted as a matter of right). Indeed, "[a]s a general rule a ... court should grant a default judgment sparingly ... when the defaulting party is appearing *pro se.*" *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir.1993).

■ In determining whether a default judgment is appropriate, "the court should [accept] as true all of the factual allegations of the complaint, except those relating to damages." *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir.1981). The plaintiff is also "entitled to all reasonable inferences from the evidence offered." *Id.* Yet, the Court must still decide "'whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.'" *Smith v. Household Fin. Realty Corp. of New York (In re Smith)*, 262 B.R. 594, 597 (Bankr.E.D.N.Y. 2001) (quoting C. Wright, A. Miller & M. Kane, Federal Practice & Procedure: Civil § 2688 at 280–81, 282 (1998)). And where the claim sounds in fraud, the court must evaluate the evidence presented to assure that the plaintiff has presented a prima facie case. *In re Truong*, 271 B.R. at 742. "[T]o satisfy the requirements of

the prima facie case the plaintiff must present evidence from which a factfinder could reasonably find every element that the plaintiff must ultimately prove to prevail in the action." *Fisher v. Vassar College,* 114 F.3d 1332, 1336 (2d Cir.1997) (en banc), *cert denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Thus, the Court must consider whether the Complaint states a "legitimate cause of action," and whether Citibank has presented evidence to make out a prima facie showing of fraud under Section 523(a)(2)(A).

**B. Establishing Nondischargeability Under Section 523(a)(2)(A)**

Section 523 of the Bankruptcy Codes provides:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). At the outset, there can be no doubt that Citibank has stated a "legitimate cause of action" in contesting the dischargeability of the charges here. *See* 11 U.S.C. § 523(a)(2)(A); *Universal Bank, N.A. v. Owen (In re Owen),* 234 B.R. 857, 859 (Bankr.D.Conn.1999) (even where there has been a default, the court must consider whether the facts constitute a legitimate cause of action).

■ Exceptions to discharge under Section 523 are construed narrowly, and in favor of the debtor. *Cazenovia College v. Renshaw (In re Renshaw),* 222 F.3d 82, 86

(2d Cir.2000). *See* 4 Collier on Bankruptcy ¶ 523.05 (15th ed. rev.2004) ("the statute should be strictly construed against the objecting creditor and liberally in favor of the debtor"). This rule of construction springs from a key objective of the Bankruptcy Code—to provide "the debtor 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' " *In re Renshaw,* 222 F.3d at 86 (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)). This is because "[a] fundamental objective of bankruptcy law is to provide a fresh start for the honest but unfortunate debtor which is manifested by the general policy of discharge of a debtor's indebtedness." *AT&T Universal Card Serv. Corp. v. Akdogan (In re Akdogan),* 204 B.R. 90, 93 (Bankr.E.D.N.Y.1997). *See Bank of Am. v. Jarczyk,* 268 B.R. 17, 21 (W.D.N.Y.2001) ("exceptions to discharge under the Bankruptcy Code are narrowly construed against the creditor so as to fulfill bankruptcy's goal of giving the debtor a fresh start").

■ In seeking an exception to discharge, the creditor bears the burden of proof by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The creditor must establish each of five elements: first, that the debtor made a false representation; second, that at the time it was made, the debtor knew it was false; third, that the debtor made the representation with the intent of deceiving the creditor; fourth, that the creditor justifiably relied on the representation; and finally, that the creditor sustained loss or damages that was proximately caused by the false representation. *Chase Manhattan Bank, USA, N.A. v. Giuffrida (In re Giuffrida),* 302 B.R. 119, 123 (Bankr. E.D.N.Y.2003). Where, as here, the debt-

or has defaulted, the creditor must make out a prima facie case as to each of these elements in order to be entitled to relief, and a failure to make the necessary showing as to any element will prevent a default judgment from being entered. *In re Truong,* 271 B.R. at 742 (to obtain a default judgment, the factfinder must reasonably find that all necessary elements of the cause of action are satisfied based on the evidence presented). Accordingly, the Court will consider the elements in turn.

### 1. Whether the debtor made a false representation

The first element that must be addressed is whether the debtor made a false representation to the creditor. *In re Giuffrida,* 302 B.R. at 123. Citibank argues that the Defendant's use of a credit card, signature on a cash advance slip, or execution of a ready credit check constitutes a promise by the Defendant to pay the obligation incurred at some future time, and an implied representation that the Defendant has both the intent and the ability to repay.

 This Court agrees with those courts in the Second Circuit, and the Fifth, Sixth, Eighth, and Ninth Circuits, that have found that "each time a cardholder uses his credit card, he impliedly represents to the issuing bank that he intends to repay the debt incurred." *Jarczyk,* 268 B.R. at 21 (citing cases). *See In re Giuffrida,* 302 B.R. at 125; *Colonial Nat'l Bank USA v. Leventhal (In re Leventhal),* 194 B.R. 26, 30 (Bankr.S.D.N.Y.1996); *F.C.C. Nat'l Bank v. Cacciatore (In re Cacciatore),* 1998 WL 412644, at *1 (E.D.N.Y.1998); *Citicorp Nat'l Credit & Mortgage Serv. for Citibank, N.A. v. Welch (In re Welch),* 208 B.R. 107, 110 (S.D.N.Y. 1997); *AT&T Universal Card Serv. v. Mercer (In re Mercer),* 246 F.3d 391, 404 (5th Cir.2001); *Rembert v. AT & T Uni-*

*versal Card Serv. (In re Rembert),* 141 F.3d 277, 280–81 (6th Cir.), *cert. denied,* 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998); *Universal Bank, N.A. v. Grause (In re Grause),* 245 B.R. 95, 99 (8th Cir. BAP 2000); *Anastas v. American Savings Bank (In re Anastas),* 94 F.3d 1280, 1284 (9th Cir.1996).

 Different issues are raised, however, by Citibank's argument that, each time the Defendant accessed credit, he made an implied representation that he had the ability to repay the debt. While courts have reached different conclusions, this Court is persuaded that a debtor does not make an implied representation as to his or her present ability, as opposed to intent, to repay a debt when he or she makes a credit card charge or takes a cash advance. *See In re Anastas,* 94 F.3d at 1285 ("the representation made by the card holder in a credit card transaction is not that he has an ability to repay the debt"); *In re Giuffrida,* 302 B.R. at 125 ("Lack of ability to pay ... is not implied by credit card usage."); *In re Jarczyk,* 268 B.R. at 23 (use of a credit card carries no implied representation of an ability to pay); *MBNA Am. v. Parkhurst (In re Parkhurst),* 202 B.R. 816, 822 (Bankr.N.D.N.Y.1996) ("one should not imply any representation on the debtor's part concerning his/her ability to pay at the time the card was used."); *In re Leventhal,* 194 B.R. at 30 ("it is neither factually nor legally appropriate to imply or infer a representation of ability to repay"). *But see First Card Serv., Inc. v. Flynn (In re Flynn),* 184 B.R. 8, 9 (Bankr. E.D.N.Y.1995) ("Each time a credit card is used for payment, the cardholder represents that he has the ability and the intent to repay the debt.")

This conclusion is consistent with the circumstances under which many debtors may turn to consumer credit instruments such as credit cards and convenience

checks. As at least one court has pointed out, "an implication [of an ability to pay] is contrary to the notion of credit." *Jarczyk*, 268 B.R. at 23. In fact, "[o]ne of the principal reasons people rely on credit is a present lack of ability to pay." *In re Murphy*, 190 B.R. at 332. *See In re Rembert*, 141 F.3d at 281 ("To measure a debtor's intention to pay, without more, would be contrary to one of the main reasons consumers use credit cards: because they often lack the ability to pay in full at the time they desire credit."). Further, implying a representation of an ability to pay "has been criticized for improperly shifting the burden of proof, making the debtor a guarantor of her financial condition." *In re Mercer*, 246 F.3d at 404–05. And finally, such a representation "is *not* actionable under § 523(a)(2)(A) [because] it excludes from its scope 'a statement respecting the debtor's ... *financial condition.*'" *Id.* at 405 (emphasis in original).

In sum, the record before the Court shows that Citibank has alleged facts sufficient to support a prima facie case that the Defendant made representations as to his intent to repay that proved to be false on May 3, 2003, when he charged $267.47 at EZ Tobacco, on May 11, 2003, when he charged $90 for EZPass Prepaid Tolls, and finally, on June 10, 2003, when he took a $1,500 cash advance. It does not, without more, support an inference that the Defendant made representations as to his ability to repay that proved to be false. Accordingly, the Court turns to the next factor, whether the Defendant knew that his representation concerning an intent to pay was false when made.

*2. Whether the debtor knew the representation was false at the time it was made*

▬▬ The second element that must be established is that at the time the debt-

or made the implied representation of an intent to repay, the debtor knew the representation was false. *In re Giuffrida*, 302 B.R. at 123. "'A misrepresentation is fraudulent if the maker ... knows or believes ... the matter is *not* as' represented, or 'does *not* have the confidence in the accuracy of his representation' as stated or implied, or 'knows ... he does *not* have the basis for his representation' as stated or implied." *In re Mercer*, 246 F.3d at 407 (emphasis in original) (quoting Restatement (Second) of Torts § 526). This is a critical element, as knowledge of falsity at the time that a statement is made marks the boundary between falsity and fraud.

▬▬ Whether a debtor intended to defraud a creditor within the scope of Section 523 is measured by the debtor's "actual state of mind ... at the time the charges were incurred." *See Field v. Mans*, 516 U.S. 59, 70–72, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Allegations of failure to perform are not a sufficient basis to infer a lack of intent to perform at the time the obligation was incurred. *In re Leventhal*, 194 B.R. at 31 (citing *Chase Manhattan Bank v. Murphy (In re Murphy)*, 190 B.R. 327, 333–34 (Bankr.N.D.Ill. 1995)). Rather, the creditor "must set forth sufficient specific evidence of a misrepresentation by the Debtor upon which it relied." *In re Akdogan*, 204 B.R. at 95. The allegations must show that the "debtor knew full well that any professed intention to repay was false or was known by the debtor not to be well-grounded, and that he or she nonetheless deliberately used the card to obtain goods he or she knew were beyond his or her ability to pay." *In re Parkhurst*, 202 B.R. at 822. At the same time, "[b]ecause 'few men will admit to a fraudulent intent, such intent must be established by circumstantial evidence.'" *In re Giuffrida*, 302 B.R. at 125–26 (quoting *Manufacturers Hanover Trust*

*Co. v. Pannell (In re Pannell)*, 27 B.R. 298, 302 (Bankr.E.D.N.Y.1983)).

■ Courts consider many objective factors to discern the debtor's subjective intent, including circumstantial factors suggesting that a debtor did not intend to repay the debt at the time credit charges or cash advances were incurred. *See In re Leventhal*, 194 B.R. at 31. In *Manufacturers Hanover Trust v. Dougherty (In re Dougherty)*, 143 B.R. 23 (Bankr.E.D.N.Y. 1992), the court identified several factors to consider, as follows:

1. The length of time between the charges and the filing of bankruptcy;

2. Whether an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges;

4. The amount of the charges;

5. The financial condition of the debtor when charges were made;

6. Whether the charges exceeded the credit limit of the account [ ];

7. Whether there were multiple charges on the same day;

8. Whether the debtor was employed;

9. The financial sophistication of the debtor[;]

10. Whether the debtor's spending habits suddenly changed; [and]

11. Whether the purchases were made for luxuries or necessities.

*In re Dougherty*, 143 B.R. at 25. Courts also consider whether the debtor had an objective ability to repay at the time the debt was incurred. *See Jarczyk*, 268 B.R. at 23 ("a complete lack of ability to repay is one factor that may be considered in determining the debtor's subjective state of mind at the time of credit card usage"); *In re Dougherty*, 143 B.R. at 25 (same);

*In re Giuffrida*, 302 B.R. at 125 (same); *In re Leventhal*, 194 B.R. at 30 (same).

■ While these factors are neither exclusive nor dispositive, they provide useful guidance in considering whether Citibank has made out a prima facie case that the Defendant had the subjective intent to defraud Citibank at the time that the credit charges and cash advance were incurred. As described below, the Court concludes that Citibank has not made out a prima facie case that the Defendant knowingly made false representations concerning his intent to repay the charges at issue at the time the charges were made.

*The length of time between the charges and the filing of bankruptcy*

Evidence that a debtor accessed credit within a short period before filing for bankruptcy could support an inference that the debtor did not intend to repay those charges at the time they were made. *See, e.g.*, 11 U.S.C. § 523(a)(2)(C). Here, the three charges at issue were made by the Defendant on May 3 and 11, and June 10, 2003, and the Defendant filed his bankruptcy petition on October 14, 2003. Complaint, ¶ 7. Citibank asserts that "the [Defendant] spoke with the Bank representatives on August 27, 2003 and advised [he] was filing bankruptcy.... Thus the bankruptcy and non payment intent is far closer to the advances than appears from the actual filing date." Complaint, ¶ 8. On this Motion, the Court accepts as true the well-pleaded factual allegations of the Complaint. *See supra*, p. 481. But even if, on August 27, 2003, the Defendant planned to file for bankruptcy, this does not support an inference that fifteen weeks earlier, when the credit card charges were made on May 3, 2003, and May 11, 2003, or eleven weeks earlier, when the cash advance was taken on June 10, 2003, the Defendant did not intend to

repay these debts. Accordingly, this factor does not support an inference of fraudulent intent.

*Whether an attorney has been consulted concerning the filing of bankruptcy before the charges were made*

Evidence that a debtor sought advice of counsel concerning bankruptcy, and then continued to access credit that would be discharged in bankruptcy, could lend persuasive support to an inference that the debtor did not intend to repay those charges at the time they were made. But here, Citibank has not alleged that the Defendant had consulted with an attorney about the possibility of filing for bankruptcy relief at the time the credit card charges and cash advance at issue were incurred. The record before the Court similarly does not show that the Defendant consulted with an attorney before the last transaction here at issue, which occurred on June 10, 2003. *See* Petition, Statement Pursuant to E.D.N.Y. LBR 2017–1 (indicating that the Debtor had his initial consultation with counsel on August 22, 2003). Accordingly, this factor does not support an inference of fraudulent intent.

*The number and amount of the charges*

Evidence that a debtor has made a large number of charges, or charges that are large and disproportionate in relation to the debtor's prior charges, could support an inference that the debtor did not intend to repay those charges at the time they were made. When such charges are made in close proximity to the debtor's bankruptcy filing, the inference would be even stronger. *See, e.g., Jarczyk,* 268 B.R. at 19–20 (summary judgment for debtor reversed where debtor charged over $7,000 in just over six months before filing for bankruptcy); *In re Flynn,* 184 B.R. at 9 (debt not dischargeable where, approximately three months before filing for bankruptcy, unemployed debtor took cash advances totaling $3,700 and entered into forty-two transactions for items including "china, toys, lingerie, and liquor," all in a period of less than five weeks).

Here, a total of just three charges, made over a period of five weeks, are at issue. Two are relatively modest in size—credit card charges of $267.47 and $90—and a third is a cash advance of $1,500, for a total of $1,857.47. This is a relatively small number of charges and total amount of charges, and these charges stand in contrast to the circumstances present in many successful challenges to dischargeability where debtors used their credit accounts freely and frequently in the period immediately preceding their bankruptcy filing. As a result, this factor does not support an inference of fraudulent intent at the time the charges were made.

*The financial condition of the debtor when the charges were made*

Evidence that the debtor's financial condition suffered a significant decline at or shortly before the time that credit was accessed, taken together with other evidence such as a failure to make any further payments to the creditor, could support an inference that the debtor resorted to credit to meet his or her expenses and did not intend to repay the charges when they were made. At the same time, evidence that the debtor had experienced a drop in income would not likely be sufficient to support an inference that the debtor did not intend to repay the charges when they were made, as this may well be one of the usual reasons that consumers maintain access to, and use, credit. *See In re Murphy,* 190 B.R. at 332 ("One of the principal reasons people rely on credit is a present lack of ability to pay."). *See also, In re Rembert,* 141 F.3d at 281 (the main reason debtors use credit cards is because, at the time they desire credit, they lack the ability to pay in full).

Here, the record shows that the Defendant's income dropped from $20,754 in 2002 to $12,000 for January 2003 through the October 14, 2003, filing date. Statement of Financial Affairs, Item 1. Thus, while it is not clear when in 2003 the Defendant's change in income occurred, the Court may infer that the Defendant had suffered a significant decline in financial condition at the time the charges at issue were made.

The record also shows that, despite the Defendant's apparent drop in income, he continued to make payments on his account, and was current on his minimum payments, when each of the charges at issue was incurred. In particular, the record shows that the Defendant made a payment of $400 on his account on May 16, 2003—shortly after the May 3 and May 11, 2003, charges were incurred. *See* Motion, Exhibit (credit card statements for May 22, 2003, and June 24, 2003, closing dates). The record further shows that a "Direct Access" payment of $275 was made to Citibank on May 7, 2003. *See* Motion, Exhibit (credit card statement for May 22, 2003, closing date). Finally, the record shows that the Defendant took the disputed cash advance on June 10, 2003, and did not miss a minimum payment on the account until June 16, 2003. *See* Motion, Exhibit (credit card statements for May 22, 2003, and June 24, 2003, closing dates). Where credit card debt is accumulated over a period of time in which a debtor makes his or her monthly payments, "such behavior is inconsistent with the intent to incur a debt without repaying it." *In re Anastas,* 94 F.3d at 1287. Thus, while the record supports an inference that the Defendant experienced a decline in his earnings at the time the disputed charges were made, that fact, viewed in the context of the payments on the account made by the Debtor in the same time period, does not support an inference of an intent to defraud.

*Whether the charges exceeded the credit limit of the account*

Evidence that the debtor's charges exceeded the credit limit of his or her account, particularly if the debtor had not previously exceeded the credit limit, could lend support to an inference that the debtor did not intend to comply with the other terms of the credit agreement at the time the charges were made. Here, the record before the Court shows that the Defendant had a credit limit of $19,500, and a cash advance limit of $3,300. *See* Motion, Exhibit (credit card statements for May 22, 2003, and June 24, 2003, closing dates). The record further shows that the Defendant's balance was within his credit limit after the May 3 and May 11, 2003, charges, but that his balance exceeded his credit limit by $221.13, or just over one percent, when he took the $1,500 cash advance on June 10, 2003. *See* Motion, Exhibit (statement for June 24, 2003, closing date). *See Bethpage Fed. Credit Union v. Mickel (In re Mickel),* 164 B.R. 456, 462 (Bankr. E.D.N.Y.1994) (exceeding credit limit alone is not sufficient proof of fraud); *Chittenden Trust Co. v. Griffis (In re Griffis),* 29 B.R. 110, 111 (Bankr.D.Vt.1983) ("in order for a debt to be found nondischargeable, something more than exceeding a credit limit must be shown"). *Compare In re Truong,* 271 B.R. at 746 (where debtor's spending habits change drastically and the balance exceeds the credit limit for the first time during that period, it indicates an intent to deceive). As a result, this factor lends only slight support, if indeed it lends any at all, to an inference of fraudulent intent.

*Whether there were multiple charges on the same day*

Evidence that a debtor made multiple charges on the same day, like evidence

that the debtor made a large number of charges or charges that are large and disproportionate in relation to his or her prior charges, could support an inference that the debtor did not intend to repay those charges at the time they were made. And similarly, when multiple charges are made on the same day in close proximity to the debtor's bankruptcy filing, the inference would be stronger still. *Cf. In re Truong*, 271 B.R. at 746–47; *In re Flynn*, 184 B.R. at 9.

Here, the record shows that the charges at issue were not made on the same day. Rather, two were incurred just over a week apart, on May 3, 2003, and May 11, 2003. *See* Motion, Exhibit (credit card statement for May 22, 2003, closing date). And the third, a cash advance, was taken on June 10, 2003, nearly one month after the last credit charge. *See* Motion, Exhibit (credit card statement for June 24, 2003, closing date). Thus, this factor does not tend to support an inference of fraud.

*Whether the debtor was employed*

Evidence that the debtor was not employed at the time that credit was accessed, like evidence that the debtor's financial condition had suffered a significant decline, taken together with other evidence, could support an inference that the debtor did not have an intent to repay at the time that charges were made. But here too, this factor seems unlikely to form the basis for an inference that the debtor did not intend to repay the charges when they were made, because loss of a job may well be a trigger for the use of credit by debtors who have, at the time the credit is accessed, the intention to repay when they are able to return to regular employment.

Here, Citibank does not allege that the Defendant was unemployed when the charges at issue were made. In addition, the record shows that at the time the Debtor filed his bankruptcy petition, he had been self-employed for three years, with a monthly income of $1,500. *See* Petition, Schedule I. Further, the record shows that in 2002, the year before the Defendant filed his bankruptcy petition, his gross income was $20,754. Petition, Statement of Financial Affairs, Item 1. Accordingly, this factor does not support an inference of fraud.

*The financial sophistication of the debtor*

Evidence that the debtor was financially sophisticated, taken together with other evidence, could support an inference that the debtor did not have an intent to repay at the time that charges were made. But the financial sophistication of the debtor is not likely to be dispositive. Rather, the debtor's experience and sophistication in financial matters is likely to be the lens through which other factors, such as the proximity of the charges to the bankruptcy filing, whether an attorney was consulted before the charges were made, the number and amount of the charges and whether they were made on the same day, and whether they were for luxuries or necessities, are viewed.

Here, in all events, the record before the Court does not indicate that the Debtor is financially sophisticated. The Defendant does not list any financial investments such as annuities, stocks, bonds, or pension or profit-sharing plans, in his Petition. *See* Petition, Schedule B. Nor does the Petition show that the Defendant has any interest in real property. *See* Petition, Schedule A. As a result, the Defendant's level of financial sophistication does not lend support to an inference of fraud.

*Whether the debtor's spending habits suddenly changed*

Evidence that a debtor's spending habits suddenly changed and that, for example, he or she made an unusually large number of charges, charges in unusually large

amounts, or charges for unusual types of items, could support an inference that the debtor did not have an intent to repay at the time that charges were made. Here, the record does not show that the charges at issue were part of any such sudden change in the Defendant's spending habits. Nor does Citibank allege any sudden increase in the Defendant's use of his credit line in the period preceding his bankruptcy filing. While Citibank makes reference to the Defendant's use of his credit line as "regular" until May 2003, it does not explain how the charges at issue deviated from that pattern. *See* Complaint, ¶ 7 ("the debtor accessed credit with regular usage and payments until May 2003"). And while the record does not show when the Defendant opened his Citibank account, the record shows that before the charges at issue were made, the Defendant had already accumulated a balance of more than $17,860 on his account, indicating that there had been significant usage in the past. Accordingly, this factor does not support an inference of an intent to defraud.

*Whether the purchases were made for luxuries or necessities*

Evidence that a debtor used credit to purchase luxury items, rather than necessities, could support an inference that the debtor did not have an intent to repay at the time that charges were made. Indeed, Section 523(a)(2)(C) of the Bankruptcy Code sets forth a presumption that debts owed to a single creditor aggregating more than $1,150 to purchase "luxury goods or services" in the sixty days before the order for relief in a bankruptcy case prior to filing a bankruptcy petition will not be dischargeable.

Here, it does not appear that the May 3, 2003, charge at EZ Tobacco, or the May 11, 2003, charge at EZPass Prepaid Toll, are charges for luxury items. As to

the first, courts have been reluctant to treat expenses associated with tobacco use as luxury or extravagant items. *See, e.g., Hamilton v. HEMAR Ins. Corp. of Am. (In re Hamilton),* 2003 Bankr.LEXIS 1257, at *13 (Bankr.D.N.H.2003) (where debtor had attempted unsuccessfully to quit smoking, court would not take issue with amount of tobacco expense); *In re Woodman,* 287 B.R. 589, 592–93 (Bankr. D.Me.2003) (rejecting argument that tobacco expenses are unreasonable as a matter of law and finding that they must be viewed in light of the debtor's other expenses). As to the second, the record provides no reasonable basis to infer that the Defendant's EZPass Prepaid Toll charge was a luxury expense.

The Defendant's $1,500 cash advance on June 10, 2003, by contrast, raises different issues. Citibank asserts that the Defendant accessed a cash advance of $1,500 on June 10, 2003, and the Defendant has not interposed any opposition to these allegations. Complaint, ¶ 7. At the same time, the Defendant took the cash advance more than four months before filing for bankruptcy, and even if he had filed on the earlier date of August 27, 2003, when Citibank alleges that the Defendant advised "Bank representatives" that he would be filing for bankruptcy, the cash advance would still fall outside of the sixty-day statutory period for nondischargeability under Section 523(a)(2)(C). Accordingly, this factor lends some, but not great, support to the inference of an intent to defraud.

*The debtor's ability to repay*

Evidence that a debtor did not have an objective ability to repay his or her debts at the time that new charges were incurred could support an inference that the debtor did not have an intent to repay at the time the charges were made. As several courts have found, "a complete

lack of ability to repay is one factor that may be considered in determining the debtor's subjective state of mind at the time of credit card usage." *Jarczyk*, 268 B.R. at 23. *See In re Dougherty*, 143 B.R. at 25; *In re Giuffrida*, 302 B.R. at 125; *In re Leventhal*, 194 B.R. at 30.

▮▮▮▮ At the same time, "[t]his factor alone cannot and should not be the sole basis for determining fraudulent intent." *Jarczyk*, 268 B.R. at 23. And "that the fact a debtor's credit card obligations may have exceeded his income at the time the charges were incurred does not per se sustain non-dischargeability." *In re Parkhurst*, 202 B.R. at 821–22. *See In re Welch*, 208 B.R. at 110–11. "If insolvency is to be used to draw such an inference, it must be hopeless insolvency sufficient to rebut any possibility of good faith." *In re Dougherty*, 143 B.R. at 26. Even where hopeless insolvency exists, a bankruptcy court is not required to infer fraudulent intent solely on such a finding. *In re Mercer*, 246 F.3d at 409. Indeed, the Ninth Circuit Court of Appeals admonished a bankruptcy court for improperly focusing on the fact that the debtor's living expenses exceeded his income, and using that as a basis for concluding that "[the debtor] could not have had any realistic hope of repaying his credit card debt." *In re Anastas*, 94 F.3d at 1286–87.

Citibank alleges that the fact that the Defendant "shows insufficient income on Schedule I to pay fixed expenses on Schedule J, let alone credit debt of $40,000" shows that he had an intent to defraud Citibank at the time the charges at issue were made. Complaint, ¶ 8. But the record does not show that the Defendant utterly lacked the ability to continue to make payments on his account, and indeed, the record shows that payments were made on the Defendant's account both shortly before and after the May credit

card charges at issue were incurred. *See* Motion, Exhibit (credit card statement for May 22, 2003, closing date) (reflecting payments of $275.00 on May 7, 2003, and $400.00 on May 16, 2003).

▮▮▮ Equally important, hindsight provides a deceptive perspective from which to consider whether a debtor had the ability to repay charges at the time they were incurred. This is because there is a risk that after a debtor files for bankruptcy, and with the benefit of hindsight, charges incurred by the debtor are much more likely to appear to have been beyond the debtor's ability to repay at the time they were made. Accordingly, only the strongest indications of an objective inability to repay at the time the debt was incurred should lend support to an inference of a subjective intent to defraud.

Here, the totality of the circumstances, including the relatively small size and number of the charges at issue, the payments on the Defendant's account, and the fact that the Defendant had income during the year in which the charges were made, do not rise to the level of a strong showing that, at the time the charges at issue were incurred, the Defendant lacked the objective ability to repay the charges. Accordingly, this factor does not support an inference of an intent to defraud.

## IV. CONCLUSION

On a motion for a default judgment in an action under Section 523(a)(2)(A) of the Bankruptcy Code, the plaintiff must present a prima facie case from which "the factfinder could reasonably find every element that the plaintiff must ultimately prove to prevail in the action." *Fisher*, 114 F.3d at 1336. The Court should accept as true "all of the factual allegations of the complaint, except those relating to damages," and draw "all reasonable inferences from the evidence offered." *Au Bon*

*Pain Corp.*, 653 F.2d at 65. Here, the undisputed allegations of the Complaint, and the reasonable inferences that they support, make out a prima facie case that the Defendant made false representations at the time that he accessed credit, by using a credit card and taking a cash advance. But those allegations and the reasonable inferences that they support do not support a conclusion that the Defendant knew that the representations were false at the time they were made. For those reasons, the Motion will be denied. An order in accordance with this Memorandum Decision shall be entered simultaneously herewith.

### ORDER DENYING THE MOTION OF CITIBANK (SOUTH DAKOTA), N.A. FOR DEFAULT JUDGMENT

Upon the filing of the motion for default judgment by Citibank (South Dakota), N.A. ("Citibank") on April 20, 2004, in this Adversary Proceeding commenced by Citibank on December 17, 2002, to determine the nondischargeability of a certain debt; and the Court having considered the arguments presented by the papers and the oral arguments of Citibank presented at the April 29, 2004, hearing; and for the reasons set forth in this Court's Memorandum Decision dated July 12, 2004; it is hereby

ORDERED, that the Debtor's motion for default judgment is denied.